

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*970 Broad Street, 7ᵗʰ floor*
*Newark, New Jersey 07102*

*973-645-2700*

December 4, 2018

<u>Via Email and Federal Express</u>
Gregory F. Linsin, Esq.
Blank Rome LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403

*Crim. No. 19-284 (SDW)*

Re:  <u>Plea Agreement with d'Amico Shipping Italia S.p.A.</u>

Dear Mr. Linsin:

        The United States of America, by and through the United States Attorney for the District of New Jersey and the Environmental Crimes Section of the United States Department of Justice (collectively referred to herein as the "government" or the "United States"), and defendant d'Amico Shipping Italia S.p.A. ("DSI" or "defendant"), by and through its authorized representative, enter into the following Plea Agreement pursuant to Rule 11(c)(1)(C) and Rule 11(c)(3) of the Federal Rules of Criminal Procedure:

        1.    <u>Waiver of Indictment and Criminal Charge.</u>  Defendant, having been advised through its counsel of the right to be charged by Indictment, agrees to waive that right and enter a plea of guilty to the charge brought by the government in an Information filed in the District of New Jersey as set forth below. The plea of guilty in the District of New Jersey is to be entered by defendant through its counsel, who is authorized by resolution of defendant's Board of Directors to enter a plea of guilty on defendant's behalf.  However, a senior corporate officer acceptable to the government, who also is authorized by a resolution of defendant's Board of Directors to represent defendant, shall appear and represent defendant at sentencing in the District of New Jersey. By entering the guilty plea, defendant hereby waives all objections to the form of the charging document, admits that it is in fact guilty of the offense under the principles of vicarious liability and *respondeat superior* as set forth in the Information and that the attached Joint Factual Statement (Attachment 1), dated this same day, is an accurate statement of its conduct. Defendant agrees

to enter a plea of guilty to one count of failing to maintain an accurate Oil Record Book in which all overboard discharges and disposals otherwise of oil, oily mixtures, oil residue, and bilge water that accumulated in the machinery spaces of the *M/T Cielo di Milano*, were fully recorded, in violation of Title 33, United States Code, Section 1908(a), and Title 33, Code of Federal Regulations, Section 151.25. Defendant further agrees that the offense to which it will plead guilty was committed by and through its agents and employees, certain Engine Department crew members aboard the *M/T Cielo di Milano*, whose actions were within the scope of their agency and employment and with the intent to benefit, at least in part, defendant.

2.     The Penalties.   Defendant understands that the statutory penalty applicable to the felony count to which it pleads guilty is as follows: a maximum fine of either Five Hundred Thousand dollars ($500,000), or twice the gross pecuniary gain or loss resulting from the unlawful conduct, pursuant to 18 U.S.C. § 3571(c) and (d); a term of probation of five (5) years, pursuant to 18 U.S.C. § 3561(c)(1); and a special assessment of Four Hundred dollars ($400), pursuant to 18 U.S.C. § 3013(a)(2)(B). Defendant understands that, in addition to any other penalty, the Court may order the payment of restitution to any victim of the offense pursuant to the provisions of Title 18, United States Code, Section 3663. The government and defendant (collectively, the "parties") agree that they are not aware of any factual basis that would support a finding that restitution is warranted in this case.

3.     Rights Waived by Pleading Guilty.   Through its authorized representative, defendant knowingly and voluntarily waives the following rights through its guilty plea: (a) the right to plead not guilty, and to persist in a plea of not guilty; (b) the right to a speedy and public trial before a jury; (c) the right to the effective assistance of counsel at trial; (d) the right to be presumed innocent until guilt has been established at trial beyond a reasonable doubt; (e) the right to confront and cross-examine witnesses at trial; (f) the right to compel or subpoena witnesses to appear on defendant's behalf at trial; (g) the right to testify or to remain silent at trial, at which trial such silence could not be used against defendant; and (h) the right to appeal a finding of guilt or any pretrial rulings.

4.     Applicability of Sentencing Guidelines.   Defendant understands and acknowledges that, at sentencing, the Court is required to consider the United States Sentencing Guidelines (the "U.S.S.G."), together with the other sentencing goals set forth in Title 18, United States Code, Section 3553(a). Defendant understands and acknowledges that the U.S.S.G., including Chapter Eight that provides guidance for the sentencing of corporate defendants, may be considered by the Court, except that pursuant to U.S.S.G. §§ 8C2.1 and

8C2.10, the provisions of U.S.S.G. §§ 8C2.2 through 8C2.9, pertaining to determining the fine range for corporate defendants, do not apply in cases involving environmental or obstruction crimes. Instead, the fine is to be determined under 18 U.S.C. §§ 3553 and 3571. All other sections of Chapter Eight of the Sentencing Guidelines that are applicable to corporate defendants are applicable to this case, including provisions for probation and community service.

     5.   <u>Sentencing Agreement</u>. Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and pursuant to 18 U.S.C. § 3571(d), in return for the complete fulfillment by defendant of all of its obligations under this Plea Agreement, the government and defendant agree that the sentence to be imposed by the Court includes a total monetary penalty consisting of Four Million Dollars ($4,000,000) plus the mandatory special assessment discussed below. The parties agree that the sentence should be imposed as follows:

       a.   <u>Criminal Fine</u>: Defendant shall pay Three Million Dollars ($3,000,000) of the total monetary penalty as a criminal fine.

       b.   <u>Mandatory Special Assessment</u>: Defendant shall pay a special assessment of Four Hundred dollars ($400).

       c.   <u>Community Service</u>: Defendant shall pay One Million Dollars ($1,000,000) of the total monetary penalty as organizational community service, pursuant to U.S.S.G. § 8B1.3, and in furtherance of satisfying the sentencing principles provided for under 18 U.S.C. § 3553(a). The parties have agreed that the community service payment will be made to the National Fish & Wildlife Foundation ("NFWF") and should be used as set forth below.

       (1)   NFWF is a nonprofit organization established by the United States Congress pursuant to 16 U.S.C. §§ 3701-3710. NFWF's purposes include the acceptance and administration of "property...to further the conservation and management of fish, wildlife, plants, and other natural resources," and the performance of "such other activities as will further the conservation and management of the fish, wildlife, and plant resources of the United States, and its territories and possessions for present and future generations of Americans." 16 U.S.C. §3701(b)(1), (2). NFWF is empowered to "do any and all acts necessary and proper to carry out" these purposes, including, specifically, solicitation, acceptance, administration, and use of "any gift, devise or bequest...of real or personal property." 16 U.S.C. §3701(c)(1). NFWF's Congressional charter mandates that it be governed by a Board of Directors that includes the Director of the United States Fish and Wildlife Service, the Under Secretary of Commerce for Oceans and Atmosphere, and

     - 3 -

various individuals educated or experienced in fish, wildlife, ocean, coastal, or other natural resource conservation. 16 U.S.C. §3702(b)(1), (2). NFWF is also required by its charter to submit to Congress annually a report of its proceedings and activities during such year, including a full and complete statement of its receipts, expenditures, and investments. 16 U.S.C. §3706(a), (b).

(2)      The overall purpose of the community service payment is to restore the coastal maritime environment of the District of New Jersey. In doing so, NFWF shall use the community service payment by Defendant to fund only projects that support cleanup of marine pollution, preservation of aquatic life, and/or cleanup or restoration of waters and shorelines in and around Newark Bay. The projects and initiatives considered by NFWF for funding should be focused on environmental restoration; establishment, enhancement and/or preservation of fish, wildlife, and ecosystems; and amelioration and remediation of pollution, and other threats to the marine and coastal environment and ecosystem.

d.    Payments: Defendant agrees that, if the terms of this Rule 11(c)(1)(C) Plea Agreement are accepted by the Court, the fine and special assessment shall each be paid in full on the date of sentencing, with payment to be made in the form of a check payable to "United States District Court Clerk." Defendant further agrees that, if the terms of this Plea Agreement are accepted by the Court, the community service payment shall be paid in full directly to the National Fish & Wildlife Foundation within 48 hours of sentencing. Moreover, within 24 hours of making the community service payment, defendant shall provide confirmation of the payment in writing to the United States, the United States Probation Office for the District of New Jersey, and the Clerk of the United States District Court for the District of New Jersey. Because the community service payment is designated as a criminal payment by an organization, defendant further agrees that it will not seek any reduction in its tax obligations as a result of the community service payment. In addition, because the payment constitutes community service as part of defendant's guilty plea, neither defendant nor any related entity or agent will characterize, publicize or refer to the community service payment as a voluntary donation or contribution.

e.    Probation: Defendant will be placed on organizational probation for a period of four (4) years from the date of sentencing, pursuant to 18 U.S.C. § 3561(c)(1) and U.S.S.G. §§ 8D1.1 and 8D1.2. The parties agree that defendant may apply to the Court for modification or termination of the period of probation and request a status hearing on such an application after defendant has served at least 35 months of probation. The terms of probation

shall include the following specific provisions, in addition to the Court's standard conditions:

(1)    No Further Violations.  Defendant agrees that it shall commit no further violations of the International Convention for the Prevention of Pollution from Ships, as amended (hereinafter, "MARPOL"), federal, state, or local law, and shall conduct all its operations in accordance with laws of the United States.

(2)    Payments.  Payment in full of the monetary amounts set forth herein including all special assessments, fines, and community service.

(3)    Environmental Compliance Plan.  Defendant agrees to develop, adopt, establish, implement, and fund the environmental remedial measures set forth in the Environmental Compliance Plan (the "ECP"), attached hereto as Attachment 2, during its term of probation, consistent with sentencing policies set forth in U.S.S.G. § 8D1.4.  As set forth in Attachment 2, defendant has agreed to retain the services of an outside independent Third Party Auditor to perform external audits and to fund a Court Appointed Monitor to perform the duties set forth in the ECP and to report to the Court and United States Probation Office.

f.    Whistleblower Award.  Defendant further understands, pursuant to the Act to Prevent Pollution from Ships, 33 U.S.C. § 1908(a), that the Court has discretion to award an amount equal to not more than one-half of the fine imposed by the Court to the person or persons giving information leading to conviction.  Having been advised that the government will recommend that the Court exercise its discretion and award the whistleblower and/or those certain crew members who provided information to the government up to one-half of the amount of the fine imposed by the Court, defendant agrees that it will take no position on any such award.

6.    Application of the Plea Agreement.  This Plea Agreement shall bind defendant and its successors and assigns and parent corporations.  DSI or its successors-in-interest, if applicable, shall provide each undersigned prosecuting office and the United States Probation Office for the District of New Jersey with notice of any name change, corporate reorganization, sale or purchase of vessels subject to the ECP, signing or termination of ship management contracts, or similar action affecting this Plea Agreement or the ECP, pursuant to the notification provisions set forth in the ECP. No change in name, change in corporate or individual control, corporate reorganization, change in ownership, merger, change of legal status, sale or purchase of

vessels, signing or termination of ship management contracts, or similar action, shall alter the responsibilities of defendant under this Plea Agreement. Defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this Plea Agreement.

7.  <u>Cooperation</u>.  As part of this Plea Agreement, defendant agrees that it will provide full and complete cooperation in any further investigation or prosecution of individuals in connection with potential violations of MARPOL, the Act to Prevent Pollution from Ships, false statements, and related acts of obstruction involving the *M/T Cielo di Milano.*

8.  <u>Statements</u>.  This Plea Agreement does not limit the right of defendant or the government to speak at the time of sentencing consistent with the provisions set forth in this Plea Agreement and the Joint Factual Statement, and to provide the Court and the United States Probation Office with evidence of all relevant conduct committed by defendant.  The parties agree that at sentencing each will support the agreed disposition set forth in this Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  Defendant will not make any contrary public statements regarding this Plea Agreement or the attachments hereto.

9.  <u>Non-Prosecution of Additional Offenses</u>.  Provided that defendant complies fully with the terms of this Plea Agreement, the U.S. Attorney's Office for the District of New Jersey, with respect to offenses arising within its jurisdiction, and the Environmental Crimes Section of the United States Department of Justice, with respect to offenses arising within the jurisdiction of any judicial district, agree to forgo additional criminal prosecution of defendant for any additional environmental offenses or related offenses, including but not limited to, falsification of oil record books, false statements, obstruction of justice, or additional violations of the Act to Prevent Pollution from Ships, occurring before the date of this Plea Agreement and which are known to the government at the time of the signing of this Plea Agreement. Defendant understands and agrees that neither this paragraph nor this Plea Agreement limits the prosecuting authority of any other sections or divisions of the Department of Justice, including the United States Attorney of any judicial district not a party to this Plea Agreement, or any other federal, state or local regulatory or prosecuting authorities. Furthermore, this Plea Agreement does not provide or promise any waiver of any civil or administrative actions, sanctions, or penalties that may apply, including but not limited to: fines, penalties, claims for damages to natural resources, suspension, debarment, listing to restrict rights and opportunities of defendant to contract with or receive assistance, loans, and benefits from United States agencies, licensing, injunctive relief, or remedial action to comply with any applicable regulatory

requirement. This Plea Agreement has no effect on any proceedings against any party not expressly mentioned herein, including the actual or potential criminal liability of any individuals.

10. <u>Probation Office Not Bound By Plea Agreement</u>. Defendant understands that the sentencing disposition agreed upon by the parties is not binding upon the United States Probation Office for the District of New Jersey.

11. <u>Information for Probation Office</u>. Defendant agrees to provide all available information requested by the United States Probation Office for the District of New Jersey.

12. <u>Withdrawal of Plea Agreement</u>. Defendant's plea will be tendered pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. If the sentencing judge rejects this Plea Agreement, then the Plea Agreement shall be null and void at the option of either the government or defendant. In this regard, defendant hereby waives any defense to any charge that it might otherwise have under any statute of limitations, pre-indictment delay, or the Speedy Trial Act for 120 days following any nullification or voiding of the Plea Agreement, except to the extent that such defenses existed as of the date of the signing of this Plea Agreement.

13. <u>Corporate Authorization</u>. Defendant represents that it is authorized to enter into this Plea Agreement and to bind itself and its subsidiaries to the terms of the ECP. At the time of submission of this Plea Agreement to the Court, defendant shall provide to the Court and the United States a written statement in the form of notarized legal documents certifying that defendant is authorized to enter into and comply with all of the provisions of this Plea Agreement. The resolution further shall certify that defendant's Board of Directors has authorized this action, and that all corporate formalities for such authorization have been observed.

14. <u>Waiver of Appeal</u>. Defendant, through its authorized representative, is aware that 18 U.S.C. § 3742 gives it the right to appeal the sentence to be imposed, and that other federal statutes give it the right to appeal other aspects of the conviction. In consideration of the Plea Agreement with the United States as set forth herein, defendant knowingly and voluntarily agrees to waive the following rights: (a) the right, conferred by 18 U.S.C. § 3742, to appeal the sentence imposed by the Court, including fine and community service payment; (b) the right to appeal any aspect of defendant's convictions; and (c) the right to bring any collateral attack, or any other writ or motion, that challenges defendant's conviction or sentence. No provision of this Plea Agreement shall preclude defendant from pursuing in an appropriate

- 7 -

forum, when permitted by law, an appeal, collateral attack, writ, or motion, claiming that defendant received constitutionally ineffective assistance of counsel.

15.   <u>Voluntariness of the Plea</u>.  Defendant, through its authorized representative, acknowledges that it has entered into this Plea Agreement freely and voluntarily, that it has been fully advised by counsel, and that no threats or promises were made to induce defendant to enter into the guilty plea called for by this Plea Agreement.

16.   <u>Statute of Limitations</u>.  In the event that this Plea Agreement is not accepted by the Court for any reason, or the Court determines that defendant has breached any of the terms of this Plea Agreement, the statute of limitations shall be deemed to be tolled from the date of the Plea Agreement to: (1) 120 days following the date of non-acceptance of the Plea Agreement by the Court; or (2) 120 days following the date on which a breach of the Plea Agreement by defendant is determined by the Court.

17.   <u>Completeness of Agreement</u>.  The government and defendant acknowledge that these terms constitute the entire Plea Agreement between the parties.  No promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement.  This Plea Agreement supersedes all prior understandings, whether written or oral.  This Plea Agreement cannot be modified other than in a written memorandum signed by the parties or on the record in Court.  This Plea Agreement is effective upon signature by defendant and all of the attorneys for the government.

Very truly yours,

CRAIG CARPENITO
United States Attorney

By: _____
KATHLEEN P. O'LEARY
KELLY GRAVES
Assistant U.S. Attorneys

By: _____
JOHN D. CASHMAN
Trial Attorney
Environmental Crimes Section
U.S. Department of Justice

APPROVED:

_____
DAVID ESKEW
Chief, Health Care and Government Fraud Unit

AGREED AND ACCEPTED:


On behalf of defendant d'Amico Shipping Italia S.p.A., I have been authorized by a corporate resolution of d'Amico Shipping Italia S.p.A. to sign this Plea Agreement and bind d'Amico Shipping Italia S.p.A. D'Amico Shipping Italia S.p.A. has been advised by its attorneys of its rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Plea Agreement. D'Amico Shipping Italia S.p.A. voluntarily agrees to all of the terms of this Plea Agreement. No promises or inducements have been made to D'Amico Shipping Italia S.p.A. other than those contained in this Plea Agreement.  No one has threatened or forced d'Amico Shipping Italia S.p.A. in any way to enter into this Plea Agreement. D'Amico Shipping Italia S.p.A. is satisfied with the representations of its attorneys in this matter.

_____           _____
Maurizio A. Bergamaschi                          1/3/19
D'Amico Shipping Italia S.p.A.               Date


I am counsel for d'Amico Shipping Italia S.p.A. I have discussed every part of this Plea Agreement with the authorized representative of d'Amico Shipping Italia S.p.A. I have fully advised the authorized representative of d'Amico Shipping Italia S.p.A. of its rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Plea Agreement.  To my knowledge, the decision of d'Amico Shipping Italia S.p.A. to enter into this Plea Agreement is informed and voluntary.

_____           _____
Gregory F. Linsin, Esq.                          1/3/19
Blank Rome LLP                               Date
Counsel for defendant d'Amico Shipping Italia S.p.A.

- 10 -

**ATTACHMENT 1**
**JOINT FACTUAL STATEMENT**

The United States Attorney for the District of New Jersey and the Environmental Crimes Section of the United States Department of Justice (collectively, the "United States") and defendant d'Amico Shipping Italia S.p.A. ("DSI" or "defendant") agree and stipulate to the following facts, which the United States could prove beyond a reasonable doubt, and which provide a sufficient factual basis for DSI's plea to one count of violating Title 33, United States Code, Section 1908(a) and Title 33, Code of Federal Regulations, Section 151.25, also known as the Act to Prevent Pollution from Ships ("APPS").

I.    Introduction

DSI is a shipping company with registered offices in Palermo, Italy. It is the owner of six commercial cargo vessels. From at least in or about August 2014 through on or about January 16, 2015, defendant owned the motor tanker *Cielo di Milano* (hereinafter, the "*M/T Cielo di Milano*" or the "vessel"). The *M/T Cielo di Milano* was an Italian-registered 25,382 gross ton ocean-going product tanker that transported petroleum products between the United States and Canada.

DSI is a wholly-owned subsidiary of d'Amico Societa di Navigazione S.p.A., which is an Italian-domiciled holding company with diverse interests including commercial ship owning, commercial ship operation and management, and financing. As the owner of the vessel, DSI had responsibility for the *M/T Cielo di Milano*'s compliance with safety and environmental regulations. The vessel's Engine Department was headed by a Chief Engineer, who was assisted by First, Second, and Third Assistant Engineers, as well as other crew members.  The vessel's Engine Department officers and crew members were hired by, and paid employees of, DSI. As such, the vessel's Engine Department officers and crew members (hereinafter, collectively, "Engine Department crew members") were agents or employees of DSI and acted within the scope of that agency or employment and for the intended benefit, at least in part, of DSI.

II.   Discharges in Violation of MARPOL and False Oil Record Book

From in or about August 2014 through on or about January 16, 2015 (hereinafter, the "relevant time period"), Engine Department crew members discharged machinery space bilge water and oily mixtures from the *M/T Cielo*

*di Milano,* in violation of the International Convention for the Prevention of Pollution from Ships, as amended (hereinafter, "MARPOL"). Engine Department crew members concealed these discharges by omissions and false entries in the vessel's Oil Record Book, a logbook required under MARPOL and APPS to contain written recordings of all internal transfers and overboard discharges of machinery space bilge water and oily mixtures. During the relevant time period, the vessel entered U.S. ports nine times: six entries into the Port of Bayonne, New Jersey; one entry into the Port of Paulsboro, New Jersey; one entry into the Port of Baltimore, Maryland; and another into Port Everglades, Florida.

Two different Chief Engineers directed these discharges in violation of MARPOL and knowingly falsified the Oil Record Book on board the *M/T Cielo di Milano*.[1] Both Chief Engineers failed to disclose the transfer of machinery space bilge water and oily mixtures from the bilge wells to the Sewage Holding Tank, and the subsequent discharges into the sea of such machinery space bilge water and oily mixtures from the Sewage Holding Tank. Chief Engineer Girolamo Curatolo also failed to disclose transfers of oil residue and oily mixtures from the vessel's Soot Tank to the Sewage Holding Tank, as well as subsequent discharges into the sea of such oil residue and oily mixtures from the Sewage Holding Tank. Curatolo also falsified the Oil Record Book to state that machinery space bilge water had been processed through the vessel's Oily Water Separator ("OWS") in December 2014, when, in fact, it had not. Curatolo further falsely recorded that the Oily Bilge Water Holding Tank[2] had been properly used to store machinery space bilge water, when instead it had been filled with fresh water on at least three occasions.

A. Discharge of Machinery Space Bilge Water and Oily Mixtures From Bilge Wells Through the Sewage Holding Tank

In accordance with MARPOL, proper management of machinery space bilge water on board the *M/T Cielo di Milano* involved the use of a bilge suction pump to draw bilge water from the vessel's machinery space bilges to a temporary storage tank called the Oily Bilge Water Holding Tank. From

---

[1] One of the Chief Engineers, Girolamo Curatolo, pleaded guilty to one count of conspiring to violate APPS (Crim. No. 16-363) and was sentenced on November 21, 2016, to eight months' imprisonment. First Assistant Engineer Danilo Maimone pleaded guilty on August 11, 2016, to one count of conspiring to obstruct justice (Crim. No. 16-364) and is awaiting sentencing.

[2] The vessel's International Oil Pollution Prevention (IOPP) Certificate identifies the Oily Bilge Water Holding Tank by size and location, noting that it is for storing machinery space bilge water. This same tank is listed as the Bilge Holding Tank on vessel drawings.

there, the machinery space bilge water and oily mixtures contained in the Oily Bilge Water Holding Tank would have been transferred to the OWS for filtering. If the resulting effluent, according to the OWS's Oil Content Meter ("OCM"), was less than 15 parts per million of oil, the effluent would have been discharged into the sea. If not, under proper management methods, the OWS would have sounded an alarm and re-routed the effluent to the Oily Bilge Tank, where it would have been burned in the incinerator or stored until off-loaded at a shore-side reception facility.

Instead of processing the machinery space bilge water and oily mixtures in accordance with MARPOL, as described above, Engine Department crew members pumped machinery space bilge water and oily mixtures directly to the Sewage Holding Tank. The Sewage Holding Tank aboard the *M/T Cielo di Milano* was designed to hold only the effluent from the vessel's approved sewage treatment plant.  After Engine Department crew members pumped machinery space bilge water and oily mixtures into the Sewage Holding Tank, they subsequently released the machinery space bilge water and oily mixtures into the sea, without processing or monitoring by an OCM, through the Sewage Holding Tank discharge valve. This practice began in or about August 2014, and continued through on or about January 16, 2015. Under the direction of Curatolo, flexible hoses and a portable pump, known as a Wilden pump, which contained no filter, were used to draw suction from the machinery space bilge wells and pump machinery space bilge water and oily mixtures to the Sewage Holding Tank. Under the prior Chief Engineer, the installed bilge pump, which also had no filter, was used to pump machinery space bilge water and oily mixtures from the Oily Bilge Water Holding Tank to the Sewage Holding Tank.

Under orders of Curatolo, which were conveyed at times by First Assistant Engineer Maimone, the crew set up the Wilden pump and flexible hoses whenever the vessel departed a port and stored them in the steering gear room of the vessel whenever it entered port. Between in or about August 2014 and on or about January 16, 2015, the crew routinely pumped machinery space bilge water and oily mixtures from the bilges into the Sewage Holding Tank prior to entering port.  At times, the crew also pumped machinery space bilge water and oily mixtures from the bilges into the Sewage Holding Tank while the vessel was sailing and when the levels of the bilges were high. The valve on the Sewage Holding Tank, which released the machinery space bilge water and oily mixtures directly into the sea, was opened, and remained open, after the vessel had departed port. It was closed only when the vessel was in port. Certain of these discharges in violation of

MARPOL took place within the exclusive economic zone, that is, within 200 nautical miles of the United States.

None of the transfers of machinery space bilge water and oily mixtures from the bilge wells to the Sewage Holding Tank were recorded in the vessel's Oil Record Book. Further, none of the discharges of machinery space bilge water and oily mixtures from the Sewage Holding Tank directly into the sea, in violation of MARPOL, were recorded in the Oil Record Book.

On at least three occasions, Curatolo also directed Engine Department crew members to place fresh water into the Oily Bilge Water Holding Tank to make it appear to governmental authorities, such as the United States Coast Guard (hereinafter, the "Coast Guard"), that the tank had been used, when, in fact, it had not. At times, these orders were conveyed through Maimone.

B.    Discharge of Oil Residue and Oily Mixtures from the Soot Tank through the Sewage Holding Tank.

The *M/T Cielo di Milano*'s Soot Tank was designed to collect waste from the cleaning of the main engine exhaust gas boiler, also referred to as the economizer. However, during the relevant time period, the Soot Tank was not used for its intended purpose. It instead was used to receive condensation that had collected in a horizontal section of a vent line emanating from the Incinerator Waste Oil Tank. This condensation would collect in the vent line whenever the Incinerator Waste Oil Tank was heated. To prevent the condensation from building up in the Incinerator Waste Oil Tank and blocking the vent line, an unapproved pipe was fashioned to run from the vent line to the Soot Tank, thus allowing the condensation, which contained oil residue, to drain into and collect in the Soot Tank. Approximately every two weeks, lower-level Engine Department crew members, at the direction of Curatolo, transferred the contents of the Soot Tank, including the oily mixtures from the vent line, to the Sewage Holding Tank via a Wilden pump and a set of flexible hoses. The crew, at the direction of Curatolo, subsequently discharged the oil residue and oily mixtures overboard instead of properly disposing of them at a shore-side reception facility. While the vessel was in port, the crew stored this Wilden pump and the associated flexible hoses in the vessel's steering gear room.

None of the transfers of oil residue and oily mixtures from the Soot Tank to the Sewage Holding Tank were recorded in the vessel's Oil Record Book. Further, none of the discharges of oil residue and oily mixtures from

the Sewage Holding Tank directly into the sea, in violation of MARPOL, were recorded in the Oil Record Book.

III.    Obstruction of Justice

On or about January 16, 2015, the Coast Guard conducted an inspection of the vessel in the Port of Bayonne, New Jersey. That inspection was obstructed in multiple ways by Engine Department crew members. Curatolo presented to the Coast Guard an Oil Record Book containing omissions and false entries that hid improper discharges, improper internal transfers, and the failure to use the OWS. In addition, Curatolo and Maimone instructed lower-level Engine Department crew members to lie to Coast Guard inspectors, which those crew members subsequently did.

Curatolo and Maimone also lied to the Coast Guard. Curatolo falsely stated that: 1) he took his own soundings of on board tanks because the Engine Cadet's soundings were inaccurate; 2) he was not aware of any illegal discharges; 3) he was not aware of the pumping of bilge water to the Sewage Holding Tank; 4) he had not seen any hoses going to the Sewage Holding Tank; and 5) he had never seen the Wilden pumps used for anything other than to transfer lube oil drums to the vessel or water to other tanks. Maimone falsely denied both that the crew had engaged in any illegal activity and that he had knowledge of transfers of bilge water to the Sewage Holding Tank.

After the Coast Guard departed the vessel, Curatolo destroyed a notebook containing tank soundings that had been prepared and maintained by the Engine Cadet. He did so by ripping out the pages, rolling them up, and burning them in the vessel's boiler flame in order to conceal the notebook from the Coast Guard. Curatolo then instructed the Engine Cadet not to disclose the burning of the sounding notebook to the Coast Guard.

*   *   *

During the pendency of the investigation, defendant voluntarily funded educational programs for most of the crew members and international travel for most of the crew members and their families to facilitate visitations.

**ATTACHMENT 2**

**ENVIRONMENTAL COMPLIANCE PLAN**

# TABLE OF CONTENTS

**Page**

I.  APPLICABILITY, PURPOSE, AND DEFINITIONS .................................................. 1

    A.  Vessels to Which Applicable .................................................................... 1
    B.  Persons to Whom Applicable ................................................................... 1
    C.  Purpose ..................................................................................................... 1
    D.  Definitions ................................................................................................ 1
    E.  Incorporation ............................................................................................ 3
    F.  Supplementation of Crews and Shore-Side Resources ........................... 3
    G.  Consequences of Employee Obstruction of ECP .................................... 3
    H.  Modifications ............................................................................................ 4
    I.  Obligation to Maintain Copies of ECP and EMS .................................. 4
    J.  Right of Inspection .................................................................................. 4

II.  REPORTS AND COMMUNICATIONS ................................................................ 4

    A.  Submission of Documents ........................................................................ 4

III.  CORPORATE STRUCTURE AND RESPONSIBILITIES .................................. 4

    A.  Corporate Compliance Manager .............................................................. 4
    B.  Reporting of Non-Compliance (Open Reporting)................................... 6
    C.  Corporate Accountability ........................................................................ 7
    D.  Full Cooperation ...................................................................................... 8
    E.  HSQE System and Internal Audits .......................................................... 8

IV.  VESSEL PERSONNEL ......................................................................................... 9

    A.  Engineers.................................................................................................. 9
    B.  Master ..................................................................................................... 11

V.  SHORE-SIDE COVERED PERSONNEL ............................................................ 12

    A.  Operation, Maintenance, and Repair Personnel.................................... 12
    B.  Critical Environmental Components....................................................... 12

VI.  COURT APPOINTED MONITOR ...................................................................... 13

    A.  Selection of Court Appointed Monitor ................................................. 13
    B.  Staff Qualifications ................................................................................ 13
    C.  Compensation and Expenses.................................................................. 13
    D.  Confidentiality ....................................................................................... 13
    E.  Reports and Notifications ....................................................................... 14
    F.  Tasks and Responsibilities..................................................................... 14

VII.  THIRD PARTY AUDITOR ................................................................................ 14

    A.  Selection of Third Party Auditor........................................................... 14

144883.06501/105962873v.3

B.    Qualifications ................................................................................... 15
C.    Adequacy of Staff ............................................................................ 15
D.    Contract, Compensation, and Expenses ...................................... 15
E.    Contractual Independence .............................................................. 15
F.    Functional Independence ................................................................ 15
G.    Confidentiality .................................................................................. 16
H.    CAM Access ...................................................................................... 16
I.    TPA Access ........................................................................................ 16

VIII.   AUDITING PROCESS .................................................................................... 16

A.    Timing and Numbers of Audits ..................................................... 16
B.    Audit Scope ....................................................................................... 17
C.    Audit Protocols ................................................................................ 22
D.    Audit Reports .................................................................................... 22
E.    TPA's Annual Report and Findings .............................................. 24
F.    TPA Audit Findings and Corrective and Preventive Actions ..... 25

IX.   ENGINEERING REQUIREMENTS ................................................................ 25

A.    Time of Implementation .................................................................. 25
B.    Environmental Control System ..................................................... 25
C.    Waste Tank Piping ........................................................................... 26
D.    Bilge-Main Cross Connections ...................................................... 27
E.    Emergency Bilge Suctions .............................................................. 27
F.    Blank Flanges .................................................................................... 27
G.    Additional OWS / OCM Requirements ........................................ 27
H.    Recordkeeping .................................................................................. 28
I.    Oil Record Book Entries .................................................................. 29
J.    Tank Sounding Records ................................................................... 29
K.    Fuel Oil/Lube Oil Purifier Settings and Line Breaks .................. 29
L.    Oil-to-Sea Interfaces ........................................................................ 29
M.    Fleet Engineering Survey ................................................................ 30

X.   ENVIRONMENTAL MANAGEMENT SYSTEM ............................................ 30

A.    Environmental Management System ............................................. 30
B.    Final Proposed Update to the EMS ............................................... 31

XI.   CHANGES RELATED TO COVERED VESSELS .......................................... 31

A.    Notification of Changes ................................................................... 31
B.    Fleet Acquisitions ............................................................................. 31

XII.   SELF-ENFORCEMENT .................................................................................. 32

XIII.   SCHEDULE .................................................................................................... 32

XIV.   ACKNOWLEDGEMENT ............................................................................... 32

ATTACHMENT 1  Covered Vessels with Certificates of Financial Responsibility ................... 33

144883.06501/105962873v.3

ATTACHMENT 2  Environmental Management System ............................................................... 34
ATTACHMENT 3  Employee Training Program ..................................................................... 38
ATTACHMENT 4  EMS Standard Operating Procedures .......................................................... 40
ATTACHMENT 5  List of Report Recipients ....................................................................... 43

144883.06501/105962873v.3

## Environmental Compliance Plan

The following standards and requirements for an Environmental Compliance Plan ("ECP") have been prepared pursuant to the Plea Agreement dated this same date between defendant, d'Amico Shipping Italia S.p.A. ("defendant" or "DSI"), and the United States Attorney's Office for the District of New Jersey and the Environmental Crimes Section of the United States Department of Justice (collectively, the "Government"). Pursuant to Paragraph 5(e)(3) of the Plea Agreement, DSI has agreed to fully fund and implement this ECP with respect to the vessels and personnel described below.

### I.  APPLICABILITY, PURPOSE, AND DEFINITIONS

#### A.  Vessels to Which Applicable

This ECP applies to all ocean-going vessels that are owned, operated, and/or manned by DSI and that carry a Certificate of Financial Responsibility ("COFR"), issued pursuant to the Oil Pollution Act of 1990 ("OPA 90"). These applicable vessels are listed in Attachment 1, as may be amended per Section XI, and hereafter referred to as the "Covered Vessels."

#### B.  Persons to Whom Applicable

This ECP shall also apply to all shore-side employees and shipboard crews involved with the operation and technical management of the Covered Vessels, who are hereafter referred to as the "Covered Personnel."

#### C.  Purpose

The purpose of this ECP is to ensure that the Covered Vessels fully comply with all applicable marine environmental protection requirements established under applicable international, flag State, port State, and coastal state law; and United States laws including, but not limited to, the International Convention for the Prevention of Pollution from Ships ("MARPOL"), and all applicable federal and state statutes and regulations including, but not limited to the Ports and Waterways Safety Act ("PWSA"), the Act to Prevent Pollution from Ships ("APPS"), the Clean Water Act ("CWA") including the Environmental Protection Agency's Vessel General Permit ("VGP"), and OPA 90, and to the additional requirements and policies established by this ECP itself. In the case of a conflict between this ECP and any of the aforementioned requirements such that this ECP is less restrictive, the more restrictive authority shall govern.

#### D.  Definitions

*Annual Report of Findings* means the annual report prepared by the TPA pursuant to Section VIII.E.

*Audit Finding* means an Observation, Non-Conformity, or Major Non-Conformity identified during an audit required under this ECP.

*Audit Report* means the audit report prepared by the TPA pursuant to Section VIII.D.

**CAM** means the Court Appointed Monitor appointed pursuant to Section VI.

**CCM** means the Corporate Compliance Manager of DSI.

**CEO** means the Chief Executive Officer of DSI.

**Covered Personnel** means those DSI employees who are subject to this ECP pursuant to Section I.B.

**Covered Vessels** means those DSI vessels that are subject to this ECP pursuant to Sections I.A and XI.

**Critical Environmental Components** means all parts necessary for the Oily Water Separator, Oil Content Monitor, and Sewage System to operate effectively and as designed, as these components are the last line of defense to prevent pollution during the disposal of waste at sea.

**d'Amico Shipping Italia S.p.A. or DSI** means d'Amico Shipping Italia S.p.A. and all of its operating entities/subordinate companies.

**Defendant** means DSI.

**ECP** means this Environmental Compliance Plan.

**EMS** means DSI's Heath, Safety, Quality, OH&S, Environmental, and Energy Management System ("HSQE System") developed pursuant to the International Code for the Safe Management of Ships and for Pollution Prevention ("ISM Code"), which will be updated and revised to include the requirements contained in this ECP.

**Environmental Open Report** means a report made by shipboard or shore-side personnel pursuant to DSI's Open Reporting System, of a non-compliance with this ECP, the EMS, and Marine Environmental Protection Requirements.

**Fleet** means DSI's fleet of vessels listed in Attachment 1.

**Government** means the United States Attorney's Office for the District of New Jersey and the Environmental Crimes Section of the United States Department of Justice.

**Interested Parties** means the Government, the United States Probation Office for the District of New Jersey, and the U.S. Coast Guard Office of Investigations & Analysis (CG-INV).

**Major Non-Conformity** means an observed situation where objective evidence indicates a violation of a Marine Environmental Protection Requirement or policies established by this ECP that consists of or contributes to the discharge or potential discharge of oil, or oily wastes, or other prohibited wastes into the water. It may also include the discovery of pollution prevention equipment determined to be incapable of processing and/or monitoring waste or inadequate with respect to the quantities of wastes such equipment is required to process.

**Marine Environmental Protection Requirements** means, collectively, MARPOL, APPS, the CWA including the VGP, and OPA 90.

*Non-Conformity* means an observed situation where objective evidence indicates a violation of a Marine Environmental Protection Requirement or a policy established by this ECP, regardless of whether it is immediately repaired or remedied.

*Observation* means a statement of fact made during an audit and substantiated by objective evidence that could lead to a Non-Conformity if not addressed. A single allegation that equipment was not used in accordance with documented procedures would constitute an Observation in the absence of evidence to the contrary. This would include pollution prevention equipment that requires a repair of any kind to become operational.

*ODME* means oil discharge monitoring equipment, used on tank vessels.

*Open Reporting System* means the system established pursuant to Section III.C.

*PMS* means the defendant's Planned Maintenance System, known as ShipNet, which also tracks incidents and near misses.

*Satisfactory* means when used on auditing forms and guides, the line item requirement is met and completely satisfies the ECP requirement without any additional effort on behalf of DSI.

*TPA* means the Third Party Auditor appointed pursuant to Section VII.

### E.      Incorporation

This ECP is incorporated into the Plea Agreement by reference, and DSI's compliance with the terms of this ECP will be a Special Condition of defendant's probation. DSI's failure to comply with any part of this ECP, including but not limited to: (i) refusal to pay valid charges for the CAM or TPA; (ii) failure to provide the CAM or TPA or other personnel, auditors, or inspectors the material support needed to achieve the objectives of this ECP; or (iii) failure to provide the CAM or TPA complete unrestricted access to vessels, facilities, personnel, or non-privileged documents (except to the extent such access is inconsistent with the safety and security of a vessel and its crew), may be a basis on which the Government may move to revoke or modify defendant's probation.

### F.      Supplementation of Crews and Shore-Side Resources

In the course of implementing this ECP, should inadequacies in the size and capabilities of vessel crews be identified in an audit as a contributing factor to their inability to meet the objectives of this ECP, DSI agrees to supplement crews as needed, consistent with the vessels' lifesaving arrangements, and/or to provide additional shore-side resources.

### G.      Consequences of Employee Obstruction of ECP

DSI shall take appropriate action, up to and including dismissal, against any individual who obstructs or hinders the development or implementation of this ECP, or presents false information or makes false statements during any inspection, monitoring, auditing, or inspection function required by this ECP, or to any U.S. authority performing an inspection or Port State Control activity. DSI will promptly notify the CAM and the Interested Parties of any report or evidence of obstruction or hindrance of the implementation of this ECP. DSI shall initiate an investigation and report the results of such investigation to the Interested Parties within sixty (60) days.

**H.     Modifications**

Any proposed modifications to this ECP must be made in writing and signed by the CCM on behalf of defendant. A proposed modification shall be submitted to the Interested Parties and each shall have thirty (30) days to provide written comments on the proposal. If no comments are provided within the thirty (30) day period, the modification will become effective. If an objection is made in writing within the thirty (30) day period, and DSI and the Interested Parties are unable to resolve the issue, either defendant or the Government may file a motion before the United States District Court for the District of New Jersey.

**I.     Obligation to Maintain Copies of ECP and EMS**

DSI will maintain copies of this ECP and the EMS within its existing HSQE System electronic platform and/or other electronic platforms, or in hard copy, to which senior shipboard personnel and shore-based supervisory staff must have ready access.

**J.     Right of Inspection**

DSI understands that representatives of the U.S. Coast Guard may board, audit (to include personnel designated by CG-INV assisting in an audit performed by the TPA), or inspect Covered Vessels managed under this ECP at any time they are found within the jurisdiction of the United States, both pursuant to existing authority and pursuant to this ECP.

**II.     REPORTS AND COMMUNICATIONS**

**A.     Submission of Documents**

All audits, reports, and documents required by this ECP to be provided by DSI to the Interested Parties, the TPA, and the CAM shall be submitted electronically. DSI shall provide hard copies of any such materials upon request. The list of Interested Parties with submission requirements is contained in Attachment 5.

All submissions that involve discussion of an Observation, Non-Conformity, or Major Non-Conformity shall include a list in the beginning of the document identifying the Observation, Non-Conformity, or Major Non-Conformity, even if it was remedied immediately after it was identified.

**III.     CORPORATE STRUCTURE AND RESPONSIBILITIES**

**A.     Corporate Compliance Manager**

1.     Prior to sentencing, DSI shall designate a senior corporate manager as the Corporate Compliance Manager ("CCM"). The CCM shall report directly to the CEO of DSI who in turn reports to the Board of Directors of DSI and shall have overall responsibility for implementation of this ECP.

2.     The CCM position shall be filled by an individual with commercial maritime vessel operational experience, who possesses the authority to ensure full implementation of this ECP, and who is thoroughly familiar with the requirements of this ECP, and domestic and international maritime environmental laws and regulations. DSI shall provide the Interested Parties with the name and contact information of the CCM.

3.      The CCM shall be authorized to access all records, documents, facilities, and vessels, including all spaces within vessels necessary to perform their function, throughout DSI for the purpose of implementing this ECP.

4.      The CCM shall communicate with the TPA on a regular basis and will ensure that the internal and TPA audits to be performed under this ECP are carried out.

5.      The CCM shall be responsible for ensuring that Audit Findings resulting from any audit under this ECP are appropriately documented, tracked, and resolved and that resolutions are thoroughly documented in a format that can be readily audited. Documentation produced as a result of these efforts shall be made available, upon request, to any personnel performing audit functions under this ECP, including the Interested Parties.

6.      The CCM is responsible for developing and implementing a tracking mechanism to ensure that DSI takes corrective action on Audit Findings made by the TPA and makes timely reports to Interested Parties within the timeframes provided in this ECP. This tracking system shall be established no later than the thirty (30) days after sentencing. The CCM shall also be responsible for ensuring actual corrective action is taken on Audit Findings made by the TPA.

7.      The CCM shall be responsible for ensuring the maintenance and necessary upgrades of the EMS with respect to those provisions that apply across the Covered Vessels and Covered Personnel.

8.      Within three (3) months after sentencing, the CCM shall be responsible for developing a ship-level annual budget process to ensure that each Covered Vessel is provided adequate funding for shore-side disposal of wastes, including solids, bilge water, oily wastes, and sludge; the minimization and management of waste streams; the maintenance, technical upgrade, or replacement, as appropriate, of environmental equipment; and funding necessary to meet the other requirements of this ECP. Such budgets shall include a methodology to estimate quantities to be sent ashore and/or processed by the Covered Vessels, based on historical data and/or expected steaming time, bunker consumption, expected itinerary or equipment changes. All records of any waste sent ashore shall be retained onboard for three (3) years, and thereafter stored ashore for two (2) years, and be available to the TPA. Within three (3) months of sentencing, the CCM will create a system to tally and track on a quarterly basis the tons of waste, including both solid and liquid, sent ashore for each Covered Vessel. The CCM will record quarterly waste volumes by tracking daily quantities offloaded from Covered Vessels.

9.      The CCM shall be responsible for annually certifying in writing to the CEO the adequacy of Covered Vessel operating budgets, including costs related to the operation, maintenance, and repair of pollution prevention equipment, use of shore-side reception facilities, labor costs relating to maintenance of machinery spaces, and other related costs necessary to meet the objectives of this ECP. The certification shall be made with the understanding that any false information knowingly submitted is subject to prosecution under 18 U.S.C. § 1001. The CCM shall submit the certifications to the CEO and to the Board of Directors of DSI as part of the CCM's annual report, and in conjunction with the annual management reports, which will in turn be provided to the Interested Parties, as discussed below.

144883.06501/105962873v.3

10. The CCM shall review and document in a timely fashion reports of Major Non-Conformities, Non-Conformities, and Observations reported by employees and shall initiate, monitor, and document all actions taken as a result of such reports as required by Section VIII below. An investigation shall also be initiated if an anomaly is identified in a Covered Vessel's budget. The CCM shall maintain records of such reports and actions taken, and shall make them available for review by the TPA and the CAM.

11. The CCM shall ensure that DSI develops and communicates policies as part of the EMS, detailed in Attachment 2, that prohibit retaliation against those who report a violation of this ECP, the EMS, or other Marine Environmental Protection Requirements, and establish that an employee's failure to provide notification regarding any such violation is grounds for discipline or dismissal.

12. Within three (3) months of the date of sentencing, the CCM shall be responsible for establishing a DSI policy and message that is communicated to all shipboard Covered Personnel that they shall not follow illegal orders that violate international law, the laws of the United States, or DSI policy and that any such orders involving this ECP, the EMS, or other Marine Environmental Protection Requirements can and shall be reported immediately to the CCM, Master, or through the Open Reporting System, discussed below.

13. The CCM shall be responsible for ensuring the development of the training requirements, detailed in Attachment 3. As part of those training requirements, the CCM shall be responsible for ensuring that new Covered Personnel are trained that environmental policy compliance, including accurate and truthful recordkeeping, are extremely important, and that DSI will take appropriate disciplinary actions for any violations.

14. The CCM shall be responsible for ensuring the full implementation of the Engineering Requirements, established in Section IX of this ECP.

15. Within three (3) months of sentencing, the CCM shall be responsible for ensuring the development and maintenance of a system to track and report each Covered Vessel's machinery space waste quantities and storage capacities, which shall be reported to the Interested Parties on a quarterly basis.

**B.  Reporting of Non-Compliance (Open Reporting)**

1. DSI shall maintain an environmental reporting system ("Open Reporting System"). The Open Reporting System shall be available on all Covered Vessels. Through the Open Reporting System, shore-side and vessel personnel may anonymously report via a free website portal, independent email account, or toll-free phone number issues of non-compliance with this ECP, the EMS, and Marine Environmental Protection Requirements.

2. DSI must provide any crew member aboard the Covered Vessels with information about the Open Reporting System within the first fourteen (14) days of each term of employment, and shall inform its shipboard Covered Personnel of the availability of this reporting system by posting notices in common lounge spaces of officers and crew members, and the engine control room, as well as through

company publications and organization-wide announcements issued on at least an annual basis. Crew shall be advised that incidents where components of pollution equipment are improperly used, manipulated, or inoperable must also be reported.

3. DSI shall be responsible for maintaining this Open Reporting System.

4. DSI shall establish procedures for and make arrangements to ensure anonymity of such reporting when desired by the individual making the report.

5. The CCM shall promptly disclose to the CAM any Environmental Open Report containing a credible allegation of a violation by Covered Personnel of any Marine Environmental Protection Requirement or requirement of this ECP. The CCM's disclosure will include the Environmental Open Report and any documents or files (including photographs or video) attached or included by the reporter. The CAM is responsible for prompt disclosure to the Interested Parties of the same materials. DSI shall initiate an investigation of such Environmental Open Reports, pursuant to its incident investigation policy, and report the results of such investigation to the CAM and the Interested Parties within sixty (60) days.

6. All Environmental Open Reports relating to a Covered Vessel shall be fully disclosed to the TPA prior to an external audit of that Covered Vessel.

7. The CCM shall ensure that summary information about the Environmental Open Reports, as well as incidents and near misses, is provided to shipboard management on a quarterly basis, who in turn will distribute the information to the shipboard Covered Personnel.

**C.    Corporate Accountability**

1. At least quarterly, the CCM shall submit written reports to DSI's CEO who in turn will provide a summary to the Board of Directors concerning compliance with and implementation of this ECP, the EMS, and other Marine Environmental Protection Requirements.

2. At least annually, the CCM shall provide to the CEO and the Board of Directors of DSI a written summary concerning compliance with and implementation of this ECP, the EMS, and other Marine Environmental Protection Requirements. All issues of non-compliance will be fully disclosed and detailed, along with any corrective action planned and/or taken. The report will highlight outstanding findings. DSI will provide copies of these reports to the CAM within ten (10) business days after the reports have been provided to the Board of Directors.

3. Six (6) months prior to the conclusion of the third year of the probationary period, and six (6) months prior to the end of the probationary period, the CCM shall ensure a trend analysis is conducted of all Major Non-Conformities, Non-Conformities, and recurring Observations, and identify corrective actions taken or recommended. The CCM shall provide a copy of the trend analysis and summary of corrective actions to the CAM and Interested Parties within ten (10) business days of the completion of each analysis. The analysis shall include an assessment of the contribution, if any, of the following factors to the identified issues:

a.   Human factors;

b.   Procedural implementation;

c.   Equipment performance and faults;

d.   Parts ordering processes;

e.   Oversight; and,

f.   Adequacy of the current pollution prevention equipment.

4.   The CCM shall promptly notify the CAM of all circumstances whereby DSI fails to fully support and finance their objectives in implementing all the requirements of this ECP and EMS.

## D.   Full Cooperation

1.   At least annually, in the first quarter of every fiscal year, DSI's CEO shall advise all employees of: i) defendant's criminal conviction and probation; ii) defendant's commitment to environmental compliance; and iii) the existence of this ECP, its material provisions, and how to access a copy of it.

2.   The CCM, the ship superintendents and the Master aboard each Covered Vessel shall take all necessary steps to ensure the full cooperation of all employees during all activities required by this ECP and EMS. Employees and entities authorized to conduct business aboard Covered Vessels shall be required to cooperate with all such activities as a condition of employment. Any failure to fully cooperate shall be addressed in a manner consistent with Section I.G. above.

3.   DSI shall provide cooperation to all persons performing audits and inspections, regardless of location. The CCM shall ensure that the CAM and the TPA, and any other inspection, auditing, monitoring personnel, or U.S. Coast Guard personnel involved in the auditing of any Covered Vessel have unrestricted access to all vessel areas (except to the extent such access is inconsistent with the safety and security of a vessel, its crew, or cargo), documentation, personnel, and material equipment. Every audited Covered Vessel or office shall provide private locations for one-on-one interviews between employees and the various inspection, auditing, or monitoring personnel. For the avoidance of doubt, a Master's decision, in his or her sole reasonable discretion, that any space on a Covered Vessel may not be accessed for reasons of safety and security shall not be deemed obstruction or grounds for discipline even if the decision is subsequently reversed.

## E.   HSQE System and Internal Audits

1.   In accordance with the ISM Code, defendant developed an HSQE System, which includes an HSQE Manual, which sets out the general policy objectives and responsibilities shipboard and shore-side. The HSQE System will be modified and refined during the term of probation consistent with this ECP.

144883.06501/105962873v.3

2.    DSI's internal audit program includes shore-side and underway shipboard audits (navigation audits, technical audits, safety inspection audits, and security audits) conducted by superintendents. During the probationary period, DSI will conduct an annual shore-side audit at the Rome, Italy office and underway shipboard audits of the vessels listed in Attachment 1.

3.    The audits shall include compliance with this ECP and Marine Environmental Protection Requirements, as well as a random review of Oil Record Books ("ORB") and follow up on Audit Findings from TPA audits and status of Environmental Open Reports, if any.

4.    Internal audit reports shall be prepared for each of the above-described audits and shall be made available to the CAM and TPA.

## IV.    VESSEL PERSONNEL

### A.    Engineers

1.    Chief Engineers on board all Covered Vessels shall be responsible for:

a.    Ensuring implementation of the Engineering Requirements established in Section IX of this ECP (as applicable to his/her vessel), as well as the ship specific Bilge Water and Sludge Management requirements described in Attachment 4, documenting any variations thereto.

b.    Assisting in the audit process, which must include the various requirements, policies and procedures addressed in Section VIII.

c.    Monitoring and managing shipboard machinery space wastes, and reviewing logs associated with the conditions of any equipment having oil-to-sea interfaces on a weekly basis. Reviewing entries made in the ORB and signing each entry prior to submitting the ORB to the Master for his/her signature. Looking for anomalies regarding increasing or decreasing levels of bilge water in the bilge water tank(s) and comparing the rated capacity of the Oily Water Separators ("OWSs") and/or the clean bilge water tank pump, as applicable, to the actual volumes being processed per hour. Reviewing ORB entries to help ensure they are being made in accordance with MEPC 1/Circ.736/Rev.2 guidance, and any Flag-specific requirements.

d.    Timely resolving (through repairs and/or applicable EMS procedures) engine room or machinery space related environmental concerns, such as inoperative or ineffective pollution prevention equipment, waste handling or monitoring equipment, and leakages stemming from pump seals, packing glands or line breaks, tank overflows, or any other causes contributing to the accumulations of bilge fluids, oily mixtures and sludge type wastes.

e.    Ensuring that all engine room wastes that are subject to special handling requirements are properly managed.

f.    Ensuring that all shipboard engine room personnel receive appropriate training applicable to their position on environmental policies and

144883.06501/105962873v.3

procedures, including but not limited to training on the operation and use of pollution prevention equipment (*e.g.*, incinerator, OWS, and Oil Content Monitor ("OCM")), and the making of entries in the ORB or any other logs required by this ECP or other Marine Environmental Protection Requirements.

g.  Ensuring that at the end of each contract and any short-term relief period the Chief Engineer's handover notes include an environmental component and description of the current status of operation, maintenance, and repair for the incinerator, OWS, OCM, and other pollution prevention procedures or equipment, the status of spare parts and overdue or canceled parts orders for the aforementioned equipment, and an estimation of the day-to-day bilge loads and accumulations. If a company-specified format for handover notes is used, this shall require descriptive entries as stated above, not solely answers marked as "Yes" or "No".

h.  Ensuring that all engineers are trained to ensure that soundings and tank measurements are properly taken and that such measurements are recorded accurately in the electronic sounding log, which is regularly synchronized with a shoreside database. Ensuring that the electronic sounding logs used by engine room personnel to record tank soundings and monitor tank levels are maintained throughout the course of probation. Whomever takes the sounding will enter it into the electronic system during their watch or shift, which record shall be dated and include the name(s) of the engineers taking the soundings.

i.  Reporting to the CCM all instances when any pollution prevention equipment requires repair parts or is not operating properly or where inadequate response associated with spare parts delivery, maintenance and repair or other factors caused conditions leading to excessive production in shipboard waste streams or inability to process waste.

j.  At a minimum, ensuring review of the following logs and records, identification of any issues that need to be corrected, and institution of any necessary corrective actions:

  i.  ORB (Part I always and Part II where applicable).

  ii.  Ship's PMS or ShipNet, and any unplanned maintenance or repair activities.

  iii.  Parts requisitions.

k.  Maintaining environmental seals as set forth in Section IX.B. of this ECP in a location only accessible by the Chief Engineer and inspect each damaged environmental seal number to ensure environmental seals having identical numbers are never used. Include an inventory of the unused environmental seals as a required component of the Chief Engineer's handover notes.

2.  All shipboard engineers on board Covered Vessels shall:

a.   Comply with the Engineering Requirements established in Section IX of this ECP (as applicable to his/her vessel).

b.   Assist in the audit process regarding the various requirements, policies and procedures addressed in Section VIII.

c.   Timely resolve (through repairs and/or applicable EMS procedures) engine room or machinery space related environmental concerns, such as inoperative or ineffective pollution prevention equipment, waste handling or monitoring equipment, and leakages contributing to the accumulations of bilge fluids, oily mixtures and sludge-type wastes.

d.   With respect to senior watchkeeping engineers, at the end of each contract, ensure that handover notes include an environmental component and description of the current status of operation, maintenance, and repair for the incinerator, OWS, OCM, and other pollution prevention equipment, the status of spare parts for the aforementioned equipment, and an estimation of the day-to-day bilge loads and accumulations, as appropriate.  If a company-specified format for handover notes is used, this shall require descriptive entries as stated above, not solely answers marked as "Yes" or "No".

e.   Report to the Master and relevant superintendent or through the Open Reporting System all instances where inadequate response associated with spare parts delivery, maintenance and repair, or other factors, including the ability of shipboard personnel to stay current with existing workloads and unfavorable conditions lead to excessive production in shipboard waste streams.

**B.   Master**

1.   In addition to any other existing statutory and regulatory requirements, the Master of each Covered Vessel bound for the United States shall ensure in its 96-hour (or 24-hour, depending upon normal transit time) Electronic Notice of Arrival ("eNOA") into a U.S. Port that the U.S. Coast Guard is informed of any inoperable equipment related to Marine Environmental Protection Requirements.

2.   In addition to his regular duties, the Master shall:

a.   Have access to the training tracking system, described in Attachment 3, with respect to Covered Personnel aboard the Master's vessel in order to ensure that these personnel have received appropriate training necessary to ensure compliance with this ECP, the EMS, MARPOL, ballast water management and all applicable maritime pollution protection requirements.  Additionally, the Master shall ensure that any checklists or quick reference guides necessary for the proper implementation of these requirements are maintained in a location on board the vessel accessible to all crew members.

b.   Maintain on board the vessel all records required by international conventions and treaties, including SOLAS, the ISM Code, MARPOL,

applicable U.S. state and federal statutes and regulations, and any additional documents or records required under this ECP and EMS. Records shall normally be maintained for five (5) years and without exception through the completion of the four (4) year period of probation. Records older than three (3) years may be stored ashore. Additionally, the Master will make such records available to the TPA and the Interested Parties upon request.

c. Personally review handover notes for the Chief Engineer, Chief Mate/Officer, First Assistant Engineer, and Second Assistant Engineer. Ensure that such handover notes are reviewed by the oncoming officer and include a descriptive environmental compliance component and information related to the status, handling, and discharge of any vessel-generated wastes, and the operation of the OWS, OCM, and incinerator, and any other pollution prevention equipment.

## V. SHORE-SIDE COVERED PERSONNEL

### A. Operation, Maintenance, and Repair Personnel

1. DSI shall require all shore-side Covered Personnel having routine involvement with any aspect of the operation, maintenance, and repair of Covered Vessels to report in writing to the CCM any information related to the inability of a Covered Vessel or its crew to comply with this ECP or any other Marine Environmental Protection Requirement. This may include, but is not limited to, information learned from contractors and technicians reviewing, working on, or discussing with shipboard personnel: orders to purchase lubrication oils, spare parts for pollution prevention equipment or equipment having oil-to-sea interfaces, requests for additional cleaning crews, reviewing or receiving information related to repairs or replacement of pollution prevention equipment, piping, or related systems, or employment of divers for underwater surveys. Such information shall also include knowledge obtained during any ship visits, audits, or inspections, regardless of the stated purpose of the particular visit, audit, or inspection.

### B. Critical Environmental Components

1. Shore-side engineering personnel shall develop and implement a system to identify Critical Environmental Components.

2. Critical Environmental Components will be identified separately in the PMS of each vessel. All Critical Environmental Components shall be promptly processed, identified as priority items, and tracked and monitored by the cognizant superintendent.

3. Superintendents shall be trained in recognizing Critical Environmental Component spare orders and supplying such spares to vessels with a minimum of delay.

144883.06501/105962873v.3

## VI.    COURT APPOINTED MONITOR

### A.    Selection of Court Appointed Monitor

During the entire probationary period, a CAM shall monitor DSI's compliance with this ECP. Within sixty (60) days of sentencing, DSI will submit to the Government a list of three (3) qualified candidates for the CAM position, from which the Government will select a candidate to serve. To the extent practicable, DSI will endeavor to submit candidates that have not provided auditing services to DSI within the last six (6) months prior to the signing of the Plea Agreement, or are not associated with the Classification Societies or Flag Administrations to which the Covered Vessels are classed or registered. In the event that none of the candidates are found acceptable, or if the work of the CAM is unsatisfactory at any time, the Government may request that DSI supply additional candidates. The government reserves the right to reject any proposed CAM.

### B.    Staff Qualifications

Should the CAM need to employ staff to fulfill its duties under this ECP, staff must have the following experience, expertise, and capabilities:

1.    Expertise and competence in the regulatory programs under United States and international marine safety and environmental laws, including the Marine Environmental Protection Requirements;

2.    Expertise and competence to assess whether DSI has adequate management systems, particularly human and fiscal resources, in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance; and

3.    Demonstrated capability to evaluate the effort and commitment of DSI in satisfying the requirements of this ECP and the EMS.

### C.    Compensation and Expenses

The reasonable compensation and expenses of the CAM, and any persons hired by the CAM in connection with its duties under this ECP, shall be paid by DSI. Compensation of the CAM and the people it hires shall be in accordance with the reasonable and customary terms commensurate with their respective experience and responsibility.

### D.    Confidentiality

The CAM shall maintain the confidentiality of any non-public information entrusted or made available to the CAM by DSI (whether directly or through the TPA or the Interested Parties). The CAM shall share such information only with the Interested Parties and the TPA, as appropriate under this ECP, and shall sign, if requested, a non-disclosure agreement with DSI memorializing the same. Within thirty (30) days after the end of the CAM's term, the CAM shall either return any information obtained from DSI, or certify that such information has been destroyed. Anyone hired by the CAM shall also sign a non-disclosure agreement with similar return or destruction requirements as set forth in this paragraph if requested.

144883.06501/105962873v.3

### E.      Reports and Notifications

DSI shall ensure that the CAM is provided all reports and notifications required by this ECP. This includes providing the CAM with access to all non-privileged internal environmental audit reports and supporting documents with respect to the Covered Vessels and Covered Personnel.

### F.      Tasks and Responsibilities

The CAM shall be assigned the following tasks and responsibilities and shall be required to provide written submissions to the Court as follows:

1. Review the relationship between DSI and the TPA, and evaluate the adequacy of measures taken to ensure that the TPA acts with independence.

2. Conduct a review and submit an annual report to DSI and the Interested Parties regarding the rounds of audits conducted by the TPA.

   a. The annual reports shall provide a summary of the CAM's findings with respect to the adequacy of the audits, internal and external, and recommendations for change made by the TPA, as well as compliance with the ECP.

   b. The annual report shall also include and address any other information of which the CAM becomes aware pertaining to DSI's capabilities to meet the objectives of this ECP, including the trends analysis, any inadequacies of the TPA or with respect to DSI's performance, whether personnel-based or related to any of its Covered Vessels, systems, equipment, or components. All reports shall be certified as true and accurate by the CAM.

3. If the CAM receives information regarding a Major Non-Conformity, or a failure of DSI to consider and act upon, as appropriate, an Audit Finding or recommendation of the TPA, the CAM must immediately report the occurrence to the Interested Parties.

4. Provide any additional reports to DSI and the Interested Parties, as requested by the Court or as appropriate, concerning any of the issues discussed in the preceding paragraphs.

## VII.    THIRD PARTY AUDITOR

### A.      Selection of Third Party Auditor

During the entire probationary period, a TPA shall conduct the audits and submit the reports described in Section VIII. Within sixty (60) days of sentencing, DSI shall submit to the Government a list of three (3) qualified candidates for the TPA position, from which the Government will select a candidate to serve. To the extent practicable, DSI will endeavor to submit candidates that have not provided auditing services to DSI within the last calendar year prior to the signing of the Plea Agreement, or is not associated with the Classification Societies or Flag Administrations to which the Covered Vessels are classed or registered. In the event that none of the candidates is found acceptable, or if the work of the TPA is unsatisfactory at any time, the Government may request that DSI supply additional candidates. The Government reserves the right to reject any proposed TPA. All work performed by the TPA and its auditors

-14-

must be certified as being accurate and truthful. The certification shall be made with the understanding that any false information knowingly submitted is subject to prosecution under 18 U.S.C. §1001.

**B.     Qualifications**

Qualified candidates for the TPA include individuals or firms that have staff capable of applying the most current International Standards Organization ("ISO") 14000 environmental management auditing criteria and have the following experience, expertise, and capabilities:

1.     expertise and competence in the regulatory programs under United States and other Marine Environmental Protection Requirements;

2.     experience in performing environmental audits in industrial or maritime environments; and;

3.     sufficient expertise and competence to assess whether DSI has adequate policies, procedures, and equipment in place to ensure compliance with this ECP and to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance.

**C.     Adequacy of Staff**

The TPA must have adequate staff to perform the work required of this ECP.  Due to the in-depth nature of the audit criteria, persons with specialized knowledge and experience will be required to perform the audits.  The knowledge, skills and abilities of the TPA and staff must align with the criteria of the audits.  Experienced personnel with extensive operational, maintenance and repair of shipboard and machinery space systems, equipment, and components is a prerequisite.  The TPA shall employ at least one senior level Marine Engineer (Chief, First or Second Engineer) to perform shipboard machinery space audits.  The TPA shall provide the Government the resumes of the TPA's auditors assigned to conduct shore-side and vessel audits.

**D.     Contract, Compensation, and Expenses**

DSI agrees to provide the government the contractual agreement between DSI and the TPA detailing the scope of work that the TPA will perform.  The reasonable compensation and expenses of the TPA, and any persons hired by the TPA in connection with its duties under this ECP, shall be paid by DSI.  Compensation of the TPA and the people it hires shall be in accordance with the reasonable and customary terms commensurate with their respective experience and responsibility.

**E.     Contractual Independence**

During the term of probation, the TPA shall not directly own any stock in DSI; must have no other ongoing contractual or business relationship, other than that of the TPA, with DSI; and may not seek or serve in other capacities with DSI, unless first disclosed to the Interested Parties, the Court, and the CAM, and unless expressly approved by the Interested Parties. The TPA must exercise independent judgment and ensure that the objectives set forth in this ECP are met.  DSI and the TPA shall notify the Interested Parties if any contractual relationships or proposed contractual relationships between DSI and the TPA arise during the term of probation.

144883.06501/105962873v.3

F.      **Functional Independence**

The TPA shall function independently of DSI, but may communicate with DSI about the substance of its work. At its discretion, the TPA, may share with DSI its audit checklist. The TPA may consult with, but shall not receive or request approval of any form from any employee of DSI regarding the development, clearance, or evaluation of any document, report, or communication of any kind, whether draft or final, required by this ECP.

G.      **Confidentiality**

The TPA shall maintain the confidentiality of any non-public information entrusted or made available to the TPA by DSI (whether directly or through the CAM or the Interested Parties). The TPA shall share such information only with the Court, Interested Parties and the CAM, as appropriate under this ECP, and shall sign a non-disclosure agreement, if requested, with DSI memorializing the same. Within thirty (30) days after the end of the TPA's term, the TPA shall either return any information obtained from DSI, or certify that such information has been destroyed. Anyone hired by the TPA shall also sign a non-disclosure agreement with similar return or destruction requirements as set forth in this paragraph if requested.

H.      **CAM Access**

The TPA agrees to provide the CAM full access to all records, personnel (including auditors), and any other information associated with its responsibilities in fulfilling the requirements of this ECP. The TPA shall provide the CAM with all audit reports.

I.      **TPA Access**

The TPA shall have full access necessary to Covered Personnel, company records, Covered Vessels (except to the extent such access is inconsistent with the safety and security of a vessel, its crew, or passengers) and shore-side facilities to perform its auditing function.

VIII.   **AUDITING PROCESS**

A.      **Timing and Numbers of Audits**

1.      Audits (as described below) shall commence as soon as is reasonably practicable after the government selects the TPA. These audits shall be of:

a.      Shore-side environmental-related operations subject to this ECP (*i.e.*, the Rome, Italy office).

b.      Covered Vessels listed in Attachment 1.

During each year, the TPA shall conduct the audits shown in the following table.

| Year of Probation | One | Two | Three | Four |
|---|---|---|---|---|
| Shoreside Audit in Rome, Italy, per Section VII.B.3. | 1 | 1 | 1 | 1 |
| Underway Audits of the Covered Vessels, per Section VII.B.2. | 2 | 2 | 2 | 3 |

-16-

2.  The TPA shall have the sole discretion to select when and which Covered Vessels to audit, consistent with scheduling and availability of those vessels.  To achieve the objectives of this ECP, audits shall take place while the vessels are underway, when systems are in operation, and when personnel are performing their normal routines. The audits may take place overseas and/or during coastwise voyages. The TPA may also perform follow-up audits on previously audited Covered Vessels for the purpose of verifying corrective actions taken with respect to Audit Findings.

3.  After the first year, one audit per year shall be unannounced.  With respect to audits of Covered Vessels, "unannounced" shall mean that the TPA is required to provide only as much notice to the vessel as may be required by local port or other regulatory requirements, if any, but recognizing that advance coordination will be required with DSI shore-side personnel.

4.  The TPA shall have the discretion to select when to conduct the shore-side audit. This program will send a strong message to personnel that DSI is serious about maintaining ongoing compliance with Marine Environmental Protection Requirements, both shore-side and shipboard.

5.  The audits during the fourth year of probation will assess DSI's full implementation of its updated EMS and evaluate, for the government, DSI's capability to ensure and sustain complete compliance with the requirements of this ECP, the EMS, and other Marine Environmental Protection Requirements.  The TPA shall provide independent verification of the status of DSI compliance with this ECP.

**B.    Audit Scope**

1.  Audits will be performed to ascertain and evaluate all areas, including the systems, equipment, components, and current practices (both documented and undocumented), and the knowledge, skills, and abilities of shipboard and shore-side Covered Personnel as they relate to the requirements of this ECP, the EMS, and Marine Environmental Protection Requirements.

2.  The TPA shall ensure that the audits conducted in each year of probation collectively cover all of the requirements below.  The decision of which of these particular requirements to focus on in any given audit, and the audit steps to test those requirements, will be committed to the discretion of the TPA.

    a.  Assess all waste streams developed from any system, equipment and components found in any engine room or machinery space onboard the vessel that may contribute to bilge loading, including observations and documentation describing any apparent leakages.  Documentation shall include photographs and/or video.

    b.  Determine the status of and quantify leakages, to the extent reasonably possible, which could impact the bilge system stemming from:

        i.   All pump and valve seals and glands during operation;

   ii.  All piping systems, flanges, gaskets, fittings and joints;

   iii.  All equipment casings such as main and auxiliary engines, and reduction gears;

   iv.  The operation of engines, boilers, incinerators, and evaporators; and

   v.  Other mechanical components found aboard the vessel.

c. Assess the performance and ability of the OWS, OCM, incinerator, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations, including an evaluation of the capacities for all tanks or containers associated with the management of oily residues (sludge), bilge water, other oily wastes, or other wastes.

d. The assessment of the performance of the OWS and OCM will specifically include an operational test of the system under actual operational conditions. This test shall include one (1) hour of continuous processing of the contents of the bilge holding tank without dilution, and without dilution of the sample line leading to the OCM, conducted in the presence of the TPA, Chief Engineer, and any other engine room personnel assigned responsibility for the operation and/or maintenance of the OWS. If an actual discharge is not feasible due to the location of the vessel or the levels of the bilge holding tanks, then the discharge shall be through a recirculation line, in accordance with procedures approved by the vessel's Classification Society provided that 1) soundings of the bilge holding tanks are made before and after the test and made a part of the audit record; 2) any alarms are recorded and made a part of the audit record; and 3) all of the above is recorded in the Oil Record Book (Part I). In the event that the assessment determines that the OWS is not operating as designed, then an immediate report shall be made to the cognizant superintendent, the CCM, the Interested Parties, and the CAM, with a copy of the engine room alarm printout to be retained and appended to the Oil Record Book page documenting the test. Any time a piece of pollution prevention equipment does not operate on the initial attempt during these audits, such activity will be documented as an Observation.

e. Assess and evaluate the documentation tracking the maintenance, repair, and modifications of all pollution prevention equipment, and notification of equipment failure to the shore-side personnel, which is tracked by SHIPNET.

f. Assess each vessel's crew and its ability to handle the operational, maintenance, and repair workloads in maintaining all systems, equipment, and components onboard in order to minimize waste stream development, and in particular assessing whether the size of the engineering crew is adequate for the customary workloads.

-18-

g.  Assess the ability of the vessel's crew to follow procedures to dispose of shipboard waste including regular garbage, machinery space and cargo-generated solid, liquid, or sludge wastes.

h.  Assess the adequacy of the EMS, current practices, and equipment associated with cargo wastes and cargo slop management (where applicable).

i.  Assess the adequacy of the EMS, procedures, current practices, and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel, and the effectiveness of garbage management plans.

j.  Assess the ODME for tank vessels and the procedures for handling residual cargo, tank washings, and cargo slops.

k.  Assess the machinery spaces for vulnerabilities to unauthorized ways to dispose of waste, and document any methods or vulnerabilities so identified.

l.  Assess the adequacy of the vessel's crew members, as appropriate, to maintain the following records:

    i.  Oil Record Book (Part I) for all vessels;

    ii.  Oil Record Book (Part II) where applicable;

    iii.  Engine Room alarm records;

    iv.  Electronic tank sounding logs;

    v.  Personnel work records and lists;

    vi.  Maintenance records;

    vii.  Vendor service records related to pollution prevention equipment or operations;

    viii.  Oily bilge water and oil residues (sludge) receipts;

    ix.  Deck Log;

    x.  Garbage Record Book;

    xi.  Oil-to-sea equipment interface records;

    xii.  Hazardous waste manifests;

    xiii.  Solid waste discharge receipts;

    xiv.  OCM calibration records;

    xv.  Training records;

144883.06501/105962873v.3

        xvi.    Inspection Documents; and

        xvii.    EMS or audit documents.

m.   Assess the adequacy of the policy, procedures, and current practices used to store and dispose of the following, if applicable:

        i.    Solvents;

        ii.    Degreasers;

        iii.    Cleaning wastes;

        iv.    Batteries;

        v.    Paints;

        vi.    Oily rags;

        vii.    Cargo residue and cargo generated wastes;

        viii.    Wastewater from cleaning of cargo tanks or cargo holds;

        ix.    Fluorescent and incandescent bulbs;

        x.    Expired boiler and engine chemicals;

        xi.    Used boiler and engine chemicals;

        xii.    Galley greases;

        xiii.    Pyrotechnics;

        xiv.    Medical supplies;

        xv.    Contaminated bunkers;

        xvi.    Used Oils and greases;

        xvii.    Incinerator ash;

        xviii.    Waste-heat recovery system washdown water;

        xix.    Waste-heat recovery system condensation;

        xx.    Transformer oils;

        xxi.    Contaminated refrigerants; and

        xxii.    Hazardous materials.

144883.06501/105962873v.3

n.   Assess and evaluate documentation showing whether all vessel officers understand the requirements of this ECP, the current environmental section of the HSQE System, and the EMS as to the obligations and responsibilities of their respective positions.

o.   Assess the EMS and current practices and procedures associated with the Master, Chief Mate/Officer, and Chief Engineer's capability to communicate regarding issues relating to the EMS with shore-side personnel, including the superintendents and the CCM, and review such communications.

p.   Assess through interviews of crewmembers and review of records the adequacy of shipboard pollution prevention and environmental protection training and meetings involving discussions of operations relating to environmental protection.

q.   Assess the current practices and procedures used on the vessel and ashore to track crewmember environmental training, and the availability of, and access to, training resources on board and ashore.

r.   Assess the adequacy of reference materials related to each environmental procedure required by this ECP, the EMS and other Marine Environmental Protection Requirements.

s.   Assess the adequacy of the Open Reporting System and evaluate whether a reporting individual may remain anonymous; further review processes for handling reports of environmental concerns made by crew members and shore-side personnel; also evaluate the adequacy of signage and instructional material posted onboard the vessel relevant to the availability and use of the existing reporting methods.

t.   Assess the Environmental Control System ("ECS") (discussed in Section IX.B. below), including the storage of ECS seals, and the prevention of the use of duplicate ECS seals.

u.   Assess the existing HSQE System and EMS procedures and equipment related to oil transfer procedures, including bunkers, bilges, and sludge discharges, and the conditions of hoses, connections, and transfer equipment, as well as methods in place to prevent illegal discharges via the shore connections.

v.   Assess the EMS procedures and the equipment used to handle emergencies, including a review of the Shipboard Oil Pollution Emergency Plan and an evaluation of the capabilities of personnel performing such duties.

w.   Assess all records related to any failure of existing safety or other management systems, including a review of Major Non-Conformities and respective corrective actions.

x.   Assess the existing HSQE System and EMS procedures associated with ballast water management.

-21-

y.   Assess the existing HSQE Systems and EMS procedures addressing compliance with the VGP.

z.   Assess the availability and content of manuals, schematics and documents required in the use of all pollution prevention equipment and activities.

aa.   Assess continual improvement systems, including procedures for ensuring that DSI policy and procedures reflect updates to MARPOL and other Marine Environmental Protection Requirements.

## C.   Audit Protocols

1.   Audit check list items shall include narrative statements indicating how audit determinations were made and the identities of individuals interviewed in the course of the audit.  All identified audit check list items will be recorded as Satisfactory or as Observations, Non-Conformities, or Major Non-Conformities. Observations, Non-Conformities, or Major Non-Conformities to be reported in the beginning of every audit report and shall be described in narrative detail.

2.   Each audit shall positively identify any Observations, Non-Conformities, and Major Non-Conformities.

3.   If during any audit, a Major Non-Conformity is noted, the TPA shall promptly notify the CCM, the CAM, and the Interested Parties, even if the violation is corrected immediately by the crew.  Such notification must include a recommended course of action.  The CCM shall ensure that the necessary notifications occur as required by applicable international and/or United States laws and regulations.

4.   If, during a test of a piece of pollution prevention equipment the TPA observes that the equipment is not operational or not operating as designed, the TPA shall promptly notify the CCM, and the Interested Parties.  Such notification must include a recommended course of action.  The CCM shall ensure that the necessary notifications occur as required by applicable international and/or United States laws and regulations.

## D.   Audit Reports

1.   The TPA shall produce an audit report for each vessel and shore-side facility audit that contains detailed Audit Findings, including the factual basis for each finding in narrative form.  Audit Findings that the audited vessel or facility was able to immediately rectify shall be included in the audit report.

2.   Audit reports shall identify and summarize in the first few pages any Observations, Major Non-Conformities, or other Audit Findings with respect to all audited items and the following particular areas of concern:

a.   Any instance of a machinery space holding tank overflowing and root cause(s), if known.

b.   Notice of improperly operating tank volume control devices.

c.     After reviewing each vessel's ORB, any indications that data has not been thoroughly verified or entered as required.

d.     Any instance in which OWS or OCM equipment does not work properly or is altered in any way, including changes to alarm or electronic recording devices (unrelated to routine maintenance).

e.     Waste volumes disposed of ashore as must be tracked in accordance with paragraph III.A.8.

3.     Audit reports shall also address any of the following issues:

a.     All allegations of environmental-related non-compliance or violations.

b.     All indications that Critical Environmental Components are not being ordered, or received, in a timely manner.

c.     Indications of poor housekeeping contributing to the accumulation of wastes.

d.     All indications of excessive leaking into the bilges or bilge loading.

e.     All instances of use of solvents or chemicals in machinery spaces that are incompatible with the OWS.

f.     OWS operation times and a comparison with alarm data and other available engine room data.

4.     Audit reports shall include, if appropriate, recommendations to correct any Audit Findings, to include the above described areas of concern.

5.     Audit reports shall contain information related to the audit's administration and identify the following:

a.     Audit scope, including the time period covered by the audit.

b.     The date(s) the on-site portion of the audit was conducted.

c.     Identification of the audit team members.

d.     Days/hours spent during onboard phase of the audit.

e.     Identification of the company representatives and regulatory personnel observing the audit, if any.

f.     The distribution list for the audit report.

g.     A summary of the audit process, including any comments on any obstacles encountered.

144883.06501/105962873v.3

   h.  In the conclusion, whether a follow-up audit of the vessel or shore-side facility is recommended within a specified timeframe to review corrective and preventive action taken.

  6.  Audit reports shall contain a narrative description of the audit certified to be true and accurate, that includes, but is not limited to, the following:

    a.  Attitude of ship and/or shore-side personnel and ship-board culture.

    b.  Conflicts pertaining to the interpretation of this ECP and its requirements (including timetables) or with respect to recommendations made by the TPA to DSI as a result of an Observation, Non-Conformity, or Major Non-Conformity.

    c.  Names and positions of those with whom the TPA discussed any conflicts in the interpretation of ECP requirements between the TPA and DSI.

  7.  The TPA shall submit all audit reports, in electronic form, to DSI, the Interested Parties, and the CAM. Upon request, the TPA shall also provide the audit working papers and any of the TPA's correspondence related to the audits. When such requests are made, the Interested Parties shall be copied. The TPA shall make hard copies of the audit reports available upon request.

## E.  TPA's Annual Report and Findings

  1.  At the conclusion of each annual round of audits, the TPA shall develop a report of findings summarizing the audits ("Annual Report and Findings"). An Annual Report of Findings must be completed within sixty (60) days of completion of each annual round of audits. It shall incorporate information obtained from the individual audit reports and shall provide DSI any recommendations to improve its EMS, including recommendations for follow-up audits where considered necessary.

  2.  If the TPA concludes it will be unable to complete its Annual Report of Findings within the sixty (60) day period, and determines that additional time will be needed to analyze available information, or to gather additional information, the TPA may request that the Interested Parties grant the TPA such additional time, as required.

  3.  Provide any additional reports as requested by the Court regarding compliance with this ECP.

  4.  DSI agrees to develop and submit a response to the TPA's Annual Report of Findings to the CAM and the Interested Parties for review and comment. Such response shall be due within sixty (60) days of receipt of such Annual Report of Findings.

144883.06501/105962873v.3

F.    **TPA Audit Findings and Corrective and Preventive Actions**

1.    DSI must address each Audit Finding of a Non-Conformity or Major Non-Conformity through corrective action with respect to the particular Covered Vessel or shore-side operation that is the subject of the Audit Finding, and, where appropriate, with preventive action across a broader set of Covered Vessels or shore-side operations if DSI determines that an Audit Finding presents a sufficiently high risk beyond the particular Covered Vessel or shore-side operation in question. If there is an unresolvable disagreement between DSI and the TPA as to an Audit Finding, such disagreement will be brought to the attention of the Interested Parties.

2.    DSI will provide the funding and resources required to facilitate implementation of corrective and preventive actions. Corrective action for Major Non-Conformities shall commence as soon as is reasonably practicable. Corrective action for other Audit Findings shall commence within forty-five (45) days of the respective audit closing meeting.

3.    The CCM shall ensure that corrective and preventive actions are taken to address any Audit Findings related to shore-side operations within DSI, taking into account any recommendations received from the TPA.

4.    When Audit Findings are related to a Covered Vessel or a broader set of Covered Vessels, the CCM shall ensure that corrective and preventive measures are taken to address such findings, taking into account any recommendations received from the TPA.

5.    As part of the CCM's annual report to the CEO and the Board of Directors of DSI required under this ECP, the CCM shall report on the status of implementation of all corrective and preventive measures.

IX.   **ENGINEERING REQUIREMENTS**

A.    **Time of Implementation**

Unless otherwise stated, all of the Engineering Requirements set forth below shall be implemented on Covered Vessels as soon as is reasonably practicable, but in any event not later than three (3) months from the date of sentencing.

B.    **Environmental Control System**

1.    DSI shall implement an Environmental Control System or ECS to help prevent unauthorized usage of connections within the engine room and machinery spaces. Under the ECS, DSI shall require crew members to use numbered seals, locks, or welds (on flanges) to prevent the unauthorized connection to, and discharge through, piping systems that are or may be connected to the oily bilge system.

2.    Seals used as part of the ECS shall be non-reusable and uniquely numbered. An ECS Seal Log shall be maintained by the Chief Engineer that records each time a seal is affixed or removed, including the date, time, seal number removed, seal number affixed, personnel involved, and reason for any seal removal or

144883.06501/105962873v.3

replacement. The keys used to open locks utilized as a part of the ECS shall be controlled.

3. Any existing seals that are found to have deteriorated or had their numbers partially or completely erased shall be replaced immediately, with the reason for replacement entered in the ECS Seal Log.

4. The CCM will be responsible for ensuring that no duplication of ECS seal numbers occur and will maintain documentation indicating which series of environmental seals have been supplied to each vessel.

## C. Waste Tank Piping

1. To prevent unauthorized manipulation of waste management systems within the engine room and machinery spaces, vessels shall maintain Classification Society-approved drawings that reflect all approved modifications made to waste management systems.

2. Vessels shall implement corporate approval procedures for any modifications made to waste management tanks or their systems. Those procedures shall require prior CCM approval for all non-emergency modifications. Any emergency modification must be reported to the TPA and CAM promptly after work is performed. Prompt approval or removal of any emergency modifications after the emergency has ended shall be required.

3. Within thirty (30) days of sentencing, the CCM shall ensure that notification is given to all Covered Vessels regarding the prohibition against using unauthorized stub pipes, cross connections, or piping on engine room waste systems. Any method to discharge overboard via the soot collection tank must be disabled and locked out unless or until the vessel's flag state or classification society determines that the overboard discharge arrangement is proper. If overboard discharges are approved from the soot tank, they must only be discharged when the vessel is underway and not less than 12 nautical miles (NM) from land.

4. Covered Personnel shall promptly notify the CCM of the existence and purpose of any unauthorized stub pipes, cross connections, or piping on engine room waste systems in a Covered Vessel. Within seven (7) days of receiving such information, the CCM shall ensure that it is relayed to the Interested Parties, along with any findings and corrective actions.

5. Classification Society-approved drawing(s) representing the current physical layout of the system shall be available on board. The Chief Engineer shall maintain documentation explaining the reason(s) for any changes/modifications made after the date of sentencing. Copies of this documentation and drawing(s) shall be maintained aboard the vessel and provided to the TPA and CAM upon request.

6. To prevent unauthorized usage of bilge water tanks or oily waste tanks, DSI shall require that ECS seals or locks be placed on all tank hatches, valves, or flanges that could allow for an external connection to the bilge water tanks or oily waste tanks. The ECS Seal Log or Lock Log shall track any time a processed bilge water tank is opened.

144883.06501/105962873v.3

**D.    Bilge-Main Cross Connections**

1.    Within thirty (30) days of sentencing, the CCM shall ensure that notification is provided to all Covered Vessels regarding the prohibition against the non-emergency usage of cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The notification shall state that such usage is similar to bypassing the OWS equipment and is strictly prohibited, except in the case of an emergency.

2.    The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby, stating – "Bilge System Piping Crossover – Emergency Use Only."

3.    To prevent unauthorized usage of those valves, DSI shall require that ECS seals be placed on such valves. The ECS Seal Log shall track any time a crossover to the bilge main is opened. If a valve is remotely operated from the engine control room, the associated push button or switch must be unable to be used without breaking an environmental seal

**E.    Emergency Bilge Suctions**

All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the vessel's engine room bilges, like those which may be connected to sea water circulating pumps, shall be painted international orange on all vessels and labeled in a manner similar to "Emergency Bilge Suction - Emergency Use Only." The valve wheels will also have a numbered and logged ECS seal capable of breakaway during emergencies, testing, and maintenance.

**F.    Blank Flanges**

1.    To prevent unauthorized connections within the engine room and machinery spaces of vessels, every blank flange connected to overboard piping, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed, or fitted with numbered ECS seals through the flange bolts that will break when such bolts are removed, to prevent unauthorized connections and discharges. The ECS seals used shall be numbered and records kept in the ECS Seal Log. Alternative sealing methods, such as numbered foil-coated sticker seals for flanges, may also be used.

2.    The blank flange securing the bilge and sludge transfer system shore connection discharge valve at the discharge stations shall also require controls as part of the ECS.

**G.    Additional OWS / OCM Requirements**

1.    The sample line from the OWS discharge connection to the sample/flush line control valve will be painted a bright color to distinguish it from other tubing and piping in the area. The line must be routed so it is clearly visible to the extent

possible for its entire length.  No additional connections or tees of any kind may be added to the line.

2.     DSI shall have the OCM manufacturer or contracted distributor to perform annual testing that ensures the OCM requires a sample flow for normal operation and control.  Any OCM that allows the OWS to function normally without sample flow is prohibited. DSI shall ensure that every vessel's OWS is configured and capable of being fully operationally tested in port with the overboard valve closed.

3.     Every vessel shall perform monthly operational tests of the OWS and OCM in the presence of the Chief Engineer, and one other engineer.  The test shall be logged in the vessel's ORB.  The Chief Engineer shall send a report to the cognizant superintendent and CCM.

4.     In addition to the operational test performed in the presence of the TPA, every vessel shall conduct an annual operational test of the OWS system under actual operational conditions.  This test shall include one (1) full hour of continuous processing of the contents of the Bilge Holding Tank without dilution, and without dilution of the sample line leading to the OCM,[1] conducted by the Chief Engineer in the presence of a DSI shore-side representative, Chief Engineer, and any other engine room personnel assigned responsibility for the operation and/or maintenance of the OWS.  If an actual discharge is not feasible due to the location of the vessel or the levels of the bilge holding tanks, then the discharges shall be through a recirculation line, in accordance with the procedures approved by the vessel's Classification Society and provided further that soundings of the bilge holding tanks shall be made before and after the test and shall be made a part of the test record and providing that any alarms shall be recorded and made part of the test record.  All of the above shall be recorded in the Oil Record Book (Part I). In the event that the assessment determines the OWS is not operating as designed, then an immediate report shall be made to the cognizant superintendent, CCM, the Interested Parties, the TPA, and the CAM, with a copy of the engine room alarm printout to be retained.

5.     Every vessel shall inspect the OWS source tanks every six (6) months and remove any accumulated oil if necessary.  The OWS source tanks shall be cleaned at least annually.  Such cleaning shall be logged in the PMS.

6.     Anytime an OCM is subject to maintenance or calibration, such actions shall be logged in the ORB.

**H.     Recordkeeping**

1.     All sounding records required by this section shall be maintained and available to auditors for the duration of the ECP.

2.     A portable pump log shall be maintained of all instances of onboard use of a pneumatic or portable pump.  The log shall include a description of the fluid

---

[1] A test performed where the source tank is diluted with water or does not contain bilge water is strictly prohibited.

pumped, its source, and the tank or location where the fluid was transferred. The log shall include the date and time the pump was used and shall identify the person(s) who checked out the pump and operated it.

### I.   Oil Record Book Entries

Entries made into the ORB shall be made and signed by the officer or officers in charge of the operation, reviewed and countersigned by the Chief Engineer, and each completed page shall be signed by Master.

### J.   Tank Sounding Records

DSI shall provide each vessel with a standard format electronic tank sounding log that includes, for each sludge and bilge tank associated with bilge water and/or oil residues (sludge), the tank name/designation, tank capacity, sounded quantity and time and method of sounding. Soundings from each tank shall be taken at least daily. The individual taking the tank sounding shall make entries in the electronic tank sounding log and sign each entry electronically.

### K.   Fuel Oil/Lube Oil Purifier Settings and Line Breaks

1.   DSI shall have a standard system for monitoring fuel oil and lube oil management on a monthly basis, including the operation of the fuel oil and lube oil purifiers. Any incident involving ships receiving poor quality fuel shall be noted in the Bunker Log or similar record once it becomes known, and such entries shall refer to the relevant bunker receipts.

2.   Any extraordinary operations (such as frequent draining of fuel oil service and settling tanks, draining engine lube oil sump tanks of excessive water) shall be recorded in the official Engine Room Log and explained to the extent possible, and the records made available for inspection.

3.   All oil leaks exceeding manufacturer or historical volumes, including any fuel and/or lubricating oil leaks resulting from mechanical failure shall be reported to the CCM.

### L.   Oil-to-Sea Interfaces

1.   DSI shall have a standard system for monitoring equipment having oil-to-sea interfaces which relies on mechanical tension, hydrostatic pressure on the seal and the surface tension between water and oil to minimize oil releases to the sea. Such interfaces may include stern tube bearings, stabilizers, controllable pitch propeller systems, maneuvering thrusters, propulsion pods, and similar equipment whereby the leakage of a sealing component may cause a loss of operating medium into the waters surrounding the vessel. Any replenishment of oil into the head tanks, operating systems reservoirs, or other receivers associated with this equipment shall be logged, regardless of the quantity involved. Ingress of water or drainage of water into or from these systems must also be logged, as far as practicable.

2.   Any extraordinary operations (such as frequent draining of fuel oil service and settling tanks, draining engine lube oil sump tanks of excessive water) shall be

144883.06501/105962873v.3

recorded in the official Engine Room Log, explained to the extent possible, and the records made available for inspection.

**M.     Fleet Engineering Survey**

1.      Within three (3) months of the date of sentencing, DSI shall issue a survey to all shipboard engineer officers on its vessels for information on how to improve MARPOL compliance, to include what new equipment, maintenance, parts, and procedures would be beneficial. An assessment requesting the frank opinions of the vessels' engineers as to their ability to adequately maintain the vessels' systems, equipment, and components will be included. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant or unsatisfactory circumstances.

2.      The CCM shall evaluate the responses and establish a plan to evaluate, test, and implement viable ideas for improvement. The CCM shall also address, to the extent practicable, legitimate maintenance concerns suggested by the vessels' engineers.

3.      A summary of the reported information and corrective actions will be provided to the Interested Parties, the CAM, and the TPA.

**X.     ENVIRONMENTAL MANAGEMENT SYSTEM**

**A.     Environmental Management System**

1.      DSI has an existing HSQE System, which includes policies and procedures that are integral to the EMS. Under this ECP, DSI will incorporate these existing elements as part of an updated EMS. As more fully described in Attachment 2, the updated EMS will include and address the following:

a.      Environmental Policy;

b.      Environmental requirements and voluntary undertakings;

c.      Objectives and targets;

d.      Structure, responsibility and resources;

e.      Operational controls;

f.      Corrective action, preventative action, and emergency procedures;

g.      Training, awareness, and competence;

h.      Organizational decision making and planning;

i.      Document control; and

j.      Continuous evaluation and improvement.

-30-

2. Within sixty (60) days after receiving the TPA's first annual Audit Report and Findings, DSI will have fully updated the EMS as necessary to ensure the EMS incorporates all the elements articulated in Attachment 2.

3. Thereafter, DSI will update the EMS as necessary or in response to findings by the TPA, the CAM, and DSI internal auditors, as appropriate.

### B. Final Proposed Update to the EMS

1. At the end of the third year of the probationary period, DSI shall submit its then-current EMS to the Interested Parties, the TPA, and the CAM.

2. If the Final Audit Report produced by the TPA recommends substantial revisions to the EMS, DSI shall, within thirty (30) days of receiving it, submit its proposed revisions to the EMS to the CAM and the Interested Parties for review.

3. The CAM and the Interested Parties may review the proposed revisions and make a recommendation to the Court as to its acceptance of the proposed revisions to the EMS.

## XI. CHANGES RELATED TO COVERED VESSELS

### A. Notification of Changes

1. On at least a quarterly basis, DSI shall notify the Interested Parties, the TPA, and the CAM of: (i) any change in name, flag of registry, recognized organization, ownership, or Classification Society of any Covered Vessel; (ii) any additions to, or removals from, the list of Covered Vessels in Attachment 1 due to any of DSI's existing vessels obtaining or relinquishing a COFR; and, (iii) the name of any new vessel with a COFR over which DSI assumes ownership or manning/operational responsibilities. DSI agrees that this ECP and its requirements shall remain in effect for all Covered Vessels, regardless of changes in the vessels' flag of registry, recognized organizations, name, or Classification Society.

2. Covered Vessels for which DSI has relinquished ownership through a vessel sale to an unaffiliated third party shall be excluded from the requirements of this ECP on the date DSI relinquishes such ownership and has so advised the Interested Parties.

### B. Fleet Acquisitions

1. For the purpose of this ECP, a "fleet" is defined as five (5) or more Covered Vessels.

2. If DSI assumes manning/operational responsibilities of a fleet during the probationary period, DSI shall perform an internal audit, using the TPA audit requirements of Section VIII of this ECP, on all vessels in the newly acquired fleet. Upon completion of such internal audits, the TPA shall conduct audits on at least 25% of the new fleet during the year of probation in which the fleet is acquired and then in accordance with, and subject to, the requirements of Section VIII for subsequent years.

-31-

## XII.   SELF-ENFORCEMENT

DSI agrees that it will undertake and implement the necessary procedures to ensure that the Covered Personnel diligently comply with this ECP and the associated requirements in their entirety.  Among other efforts, DSI shall ensure that its internal auditing procedures include the criteria established in this ECP.

## XIII.   SCHEDULE

DSI shall strictly comply with the requirements of this ECP, including the dates and periods mentioned herein.  Should DSI be unable to comply with any of the deadlines herein, DSI shall promptly notify the Interested Parties and, where relevant, the TPA and/or CAM, to request that the Interested Parties grant DSI such additional time, as required.

## XIV.   ACKNOWLEDGEMENT

Defendant DSI has read this ECP carefully and understands it thoroughly.  Defendant DSI enters into this ECP knowingly and voluntarily, and agrees to abide by its terms.

144883.06501/105962873v.3

## ATTACHMENT 1

**Covered Vessels with Certificates of Financial Responsibility**

| | VESSEL | IMO NO. |
|---|---|---|
| 1. | CIELO DI DUBLINO | 9585651 |
| 2. | CIELO DI SAN FRANCISCO | 9585663 |
| 3. | MEDI HONG KONG | 9301043 |
| 4. | MEDI VALENCIA | 9339480 |

## ATTACHMENT 2

### Environmental Management System

DSI has attained ISO 14001 certification for the technical management of vessels. The CCM shall be responsible for maintaining the EMS certified to ISO 14001 standards, which address the following elements:

### Environmental Policy

The EMS should be based upon a documented and clearly communicated policy. This policy should set out DSI's commitment to a cleaner marine environment. It should include:

- Provision for compliance with environmental requirements;

- Commitment to continuous improvement in environmental performance, including those areas required by this ECP;

- Commitment to pollution prevention that emphasizes source reduction, appropriate funding and human resources necessary to effectively maintain and repair the systems, equipment and components found in machinery spaces of vessels; and

- Commitment to continuous reduction of environmental risks.

### Environmental Requirements and Voluntary Undertakings

The EMS shall be communicated to all employees and to all vendors, technicians, and other non-crew members whose work could affect DSI's ability to meet the Marine Environmental Protection Requirements, as well as consideration of voluntary undertakings arising from industry norms or the adoption of best practices. Such communication will be executed in a manner appropriate to the circumstances.

### Objectives and Targets

The EMS will establish specific objectives and targets for:

- Achieving and maintaining compliance with all Marine Environmental Protection Requirements and the requirements of this ECP;

- Training, educating and fostering among all Covered Personnel the need for solid environmental stewardship through a conscious effort at pollution prevention and transparent recordkeeping;

- Environmental performance demonstrating continuous improvement in regulated and non-regulated areas; and,

- Pollution prevention that emphasizes source reduction, where appropriate, for the waste streams of the Covered Vessels.

The EMS shall establish appropriate time frames to meet these objectives and targets, which shall be documented and updated as necessary, as Marine Environmental Protection Requirements change or as

144883.06501/105962873v.3

operational changes occur that could impact environmental performance or as a result of recommendations made by the TPA.

## Structure, Responsibility, and Resources

DSI will ensure that it has sufficient personnel and other resources to meet its objectives and targets. The EMS will include documentation explaining the steps for achieving those objectives and targets. The EMS will include descriptions of the roles and responsibilities of all Covered Personnel, as well the accountability of the Covered Personnel with respect to meeting the requirements of this ECP and the EMS.

## Operational Control

The EMS will identify and provide for the planning and management of all DSI operations and activities with a view to achieving the EMS objectives and targets. For example, vessel deck department, engine room and machinery space maintenance and repair will be an important aspect in achieving and maintaining compliance and enhancing environmental performance.

## Corrective and Preventive Action and Emergency Procedures

DSI through its EMS, will establish and maintain documented procedures for preventing, detecting, investigating, and promptly initiating corrective actions, and reporting (both internally and externally), any occurrence that may affect its ability to achieve the EMS objectives and targets, and for promptly initiating corrective actions.

Such measures must focus particular attention on incidents that may have an effect on compliance with environmental requirements, as well as on environmental performance in regulated and non-regulated areas, including requirements of this EMS, this ECP, or other Marine Environmental Protection Requirements. Examples of such situations include incinerator or OWS malfunctions, overflows of tanks within machinery spaces, fuel oil, lube oil, saltwater line failures, operator errors and other accidental releases.

The EMS must also establish documented procedures for mitigating any adverse impacts on the environment that may be associated with accidents or emergency situations and for ensuring that similar incidents are avoided. The EMS must include procedures for tracking any preventive and corrective actions that are taken. If the environmental violation or incident resulted from a weakness in the system, the EMS should be updated and refined to minimize the likelihood of such problems recurring in the future. The EMS should also, to the extent possible, provide for the testing and evaluation of emergency procedures.

## Training, Awareness, and Competence

The EMS shall establish procedures to ensure that all Covered Personnel have been trained and are capable of carrying out their responsibilities under this ECP and the EMS. In particular, the training should highlight means to enhance the ability of such personnel to ensure compliance with environmental requirements and voluntary undertakings, the requirements of this ECP and other Marine Environmental Protection Requirements. In addition, the EMS shall provide for the proper briefing and supervision of vendors, technicians, and other non-crewmembers whose job responsibilities could affect the ability of the Covered Vessels to comply with this ECP and achieve the EMS objectives and targets.

Additional training requirements are provided in Attachment 3.

144883.06501/105962873v.3

**Organizational Decision-Making and Planning**

The EMS must describe how these various management system elements will be integrated into DSI's overall decision-making and planning, in particular, decisions on capital improvements, training programs, and vessel operations, maintenance, and repair activities.

**Document Control**

The EMS must establish procedures to ensure maintenance of appropriate documentation relating to its objectives and targets and should also ensure that those records will be adequate for subsequent evaluation and improvement of the operation of the EMS. Additionally, it will document DSI's state of compliance with Marine Environmental Protection Requirements and the requirements of this ECP. All records will be maintained for the period required under this ECP and made available upon request to the TPA and Port and Flag State personnel.

**Continuous Evaluation and Improvement**

The EMS must include methods to perform periodic, documented and objective auditing of performance in achieving these objectives and targets and on how well the EMS assists DSI in achieving those objectives and targets. This requirement is independent from the auditing requirements detailed elsewhere in this ECP. The goal of these internal audits and reviews will be to allow management to continuously monitor and access vessel systems, equipment and components, and the ability and proficiency at which vessel crewmembers and personnel ashore comply to the policies and procedures established by this EMS.

**Additionally the EMS:**

Will identify an ongoing process for assessing operations for the purposes of preventing and controlling or minimizing waste stream development and releases, ensuring environmental protection, and maintaining compliance with a primary emphasis on marine engineering, vessel engine room and machinery space systems, equipment and components and any shipboard systems having oil-to-sea interfaces. Includes a process by which a decision can made whether to take a vessel out of service for an environmental discharge related repair such as when caused by leaking stern tubes, thrusters, or other equipment.

Will include organization charts, as appropriate, that identify shore-side and vessel individuals having environmental performance, risk reduction, and regulatory compliance responsibilities. Specifies responsibilities of shore-side vessel operational and technical management to report information related to environmental releases or inadequate performance of environmental pollution protection equipment, system casualties resulting in internal spills, excessive waste development and leaking equipment with oil-to-sea interfaces.

Will promote non-retaliatory practices and ensure that employees are not punished or otherwise suffer negative consequences for reporting violations of environmental laws, regulations, or policies. Also describes potential consequences for departure from specified operating policies and procedures, including possible termination of employment; and liability for criminal/civil/administrative penalties as a result of noncompliance.

Makes compliance with environmental policies of this ECP, the EMS, and other Marine Environmental Protection Requirements a positive factor in performance evaluations, and failure to comply a basis for discipline, which may range from counseling or retraining up to an adverse performance evaluation and/or dismissal.

144883.06501/105962873v.3

Will include policies against any incentive or bonus programs based on minimizing operational costs associated with the operation, maintenance and repair of machinery space systems, equipment and components without ensuring that efficiency and performance are maintained. The intent of this policy is to ensure that employees do not avoid such costs and thereby sacrifice environmental compliance.

Will describe a confidential anonymous reporting system that is adopted to ensure that employees may quickly and confidentially report inoperable equipment or the misuse of equipment, violations of Marine Environmental Protection Requirements, discharges, spills, environmental incidents and other environmental concerns.

Will identify all operations and activities where documented standard operating procedures ("SOPs") are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on marine engineering, vessel engine room and machinery space operations, systems, equipment and components. Includes the development of SOPs and the manuals described in Attachment 4.

Will identify the types of records developed and maintained in support of this ECP and the EMS such as reports, audit working papers, correspondence, communications, reports from the confidential system for anonymous reporting, and identify personnel responsible for their maintenance, and procedures for responding to inquiries and requests for release of information.

Provides a system for conducting and documenting routine, objective, self-inspections by DSI internal auditors and Chief Engineers to check for malfunctions, deterioration, and inadequate maintenance of pollution prevention equipment, crew member adherence to SOPs, unusual situations, and unauthorized releases.

Will establish a process to ensure that in the event that budgeted funds are not sufficient for the personnel training, parts inventory and ordering, and maintenance of pollution prevention equipment required by this ECP, supplemental funds can be timely secured and deployed.

144883.06501/105962873v.3

## ATTACHMENT 3

### Employee Training Program

**Implementation and Administration**

- Within three (3) months of the date of sentencing, DSI will adopt and implement a training program to educate the Covered Personnel on the environmental impact of operations and to be aware of the policies and procedures that form the basis of this ECP and the EMS, and which otherwise meets the specific requirements of this section.

- The CCM shall be responsible for this training program and ensuring that the requirements of this section are met.

- The CCM shall ensure that the training program is uniformly implemented throughout DSI.

**Training Program**

- DSI may tailor training to the work responsibilities and department of the various types of Covered Personnel, provided that the training contains the following common elements:

  - Explanation of the corporate environmental compliance structure, including the CCM and contact information.

  - Comprehensive overview of this ECP, the EMS, and other Marine Environmental Protection Requirements.

  - Importance of environmental policy compliance, and accurate and truthful recordkeeping.

  - Sanctions and consequences for violations for the defendant and the employee, such as remedial training, suspension, termination, and civil and criminal liability.

  - Avenues for anonymous reporting.

- Where relevant for the work responsibilities of the Covered Personnel being trained, the training shall also contain the following elements:

  - Pollution prevention and minimization programs specifically as it relates to cargo, deck, and engine department procedures and operations.

  - All requirements set forth in the Engineering Requirements section of this ECP.

  - Position-specific training in the operation, maintenance, and repair of OWSs, OCMs, incinerators, and other pollution prevention equipment.

  - Procedures for solid and hazardous waste segregation, storage, disposal, and reporting of releases.

  - All other shipboard environmental protection-related procedures examined and described in Section VIII of this ECP.

- Training shall be provided by qualified instructors, who can include DSI personnel or outside consultants.

- Timing and presentation method

    - Shore-side Covered Personnel who are employed as of the date of the implementation of the training program must complete it within three (3) months from that date (that is, within the first six (6) months of the probationary period). Shore-side Covered Personnel hired after the implementation of the training program must complete it before they assume their duties.

    - Shipboard Covered Personnel who are employed as of the date of the implementation of the training program must complete it within three (3) months from that date (that is, within the first six (6) months of the probationary period) or within fourteen (14) days of coming aboard a vessel on a new contract, whichever is earlier. Shipboard Covered Personnel hired after the implementation of the training program must complete it within fourteen (14) days of commencing their duties on a new contract.

    - An assessment of competence will be conducted at least once in every calendar year. Update and refresher training will be given as required to maintain and demonstrate competence. After an employee has completed the training program, that employee must complete refresher training at least once during each calendar year thereafter.

    - The training program must be administered in-person for those Covered Personnel taking it for the first time. The refresher training can be administered via a computer-based module.

## Recordkeeping and Auditing

- The CCM will maintain a catalog that provides an overview of the training program; identifies the persons responsible for delivering the training program; and establishes a tracking system to be used to monitor the type, frequency, and successful completion of training.

- The CCM shall provide the TPA with details of the training program provided to the Covered Personnel. As part of its annual Report of Findings, the TPA shall be required to provide an assessment of the training program, both with respect to shore-side Covered Personnel and shipboard Covered Personnel.

144883.06501/105962873v.3

**ATTACHMENT 4**

**EMS Standard Operating Procedures**

**Bilge Water and Sludge Management**

- Describes DSI policy and procedures regarding management, disposal, and discharges, including the identification of persons responsible for shipboard environmental compliance.

- Describes applicable ECP and EMS requirements, which shall be compliant with applicable Port and Flag State requirements, as well as international laws, regulations, and standards, other pertinent pollution laws and regulations, MARPOL regulations and standards, as applicable.

- Describes reporting requirements (including internal and external reporting requirements relating to spills and discharges).

- Includes preventative maintenance and identifies the required inventory of all Critical Environmental Components spare parts.

- Describes fundamentals and maritime practices of waste stream minimization, including engine room housekeeping, minimization of bilge loads and leakages, and use of proper cleaning chemicals in accordance with the requirements of this ECP, the EMS, and other Marine Environmental Protection Requirements.

- Describes system operation and procedures for usage of all associated bilge management equipment, the sealing and securing of associated valves, offloading procedures and necessary operational checklists.

- Describes recordkeeping for ORBs that includes items to be recorded, as required by MARPOL and recordkeeping requirements of additional logs described in the Engineering Requirements section of the ECP.

- Describes both individual and corporate sanctions and consequences for violation of regulations, policies and procedures, including remedial training, possible suspension or termination of employment, and civil and criminal liability.

- Describes processes associated with the sealing and locking program for system crossover and connection valves where bilge systems tie into ballast, general service, and other pumping or eductor systems, and the processes for sealing other identified connections and other systems capable of bilge removal with the use of the OWS.

**Sewage Treatment**

- Describes DSI policy and procedures regarding management, disposal and discharges, including the identification of persons responsible for environmental compliance.

- Describes applicable ECP and the EMS requirements, which shall be compliant with applicable Port and Flag State requirements, as well as international laws, regulations, and standards, other pertinent pollution laws and regulations, MARPOL regulations, and standards.

- Describes internal and external reporting requirements relating to discharges.

144883.06501/105962873v.3

- Describes fundamentals and maritime practices of sewage system management in accordance with the requirements of MARPOL 73/78 and this ECP.

- Describes system operation and procedures including the standard operating procedures for usage of all sewage equipment and systems, and operational checklists.

- Describes maintenance of sewage system equipment, including routine and preventative maintenance, recordkeeping, and the identification and required inventory of critical spare parts.

- Describes sanctions and consequences for violation of regulations, policies and procedures, including individual and corporate consequences for violations, including remedial training, possible suspension or termination of employment, and civil and criminal liability.

**Hazardous and Solid Waste Management**

- Describes DSI policy and procedures regarding management, disposal and discharges, including the identification of persons responsible for environmental compliance.

- Describes applicable ECP requirements, which shall be compliant with applicable Port and Flag State requirements, as well as international laws, regulations, and, other pertinent pollution laws and regulations, MARPOL regulations, and standards.

- Describes internal and external reporting requirements for tracking and disposal of covered wastes.

- Describes fundamentals and maritime practices of waste minimization that includes discharge procedures in accordance with the requirements of MARPOL 73/78 and this ECP.

- Describes the system operation and procedures, including standard operating procedures for usage of hazardous waste management systems, off-loading procedures, and operational checklists.

- Describes procedures for completing required discharge receipts and other entries.

- Describes routine, daily and preventative maintenance, recordkeeping, and the identification and required inventory of critical spare parts.

- Describes sanctions and consequences for violation of regulations, policies and procedures, including individual and corporate consequences for violations, to include remedial training, possible suspension or termination of employment, and civil and criminal liability.

The following documentation and reference material will be readily accessible on board:

- Regulatory References

- System Schematics (where applicable)

- Tank Sounding Tables

- Tank Arrangements

- Tank Measurements and Data Necessary to Calculate Volumes

-41-

- Holding Capacities

- Critical Environmental Component Spare Parts List

- MSDS of Chemicals Used in the Engine Room

- List of Regulated Wastes

- Discharge Restrictions List

- List of Sealed Valves

- List of Locked Valves

144883.06501/105962873v.3

## ATTACHMENT 5

### List of Report Recipients / Interested Parties

1.  United States Attorney's Office, District of New Jersey:

    Kathleen P. O'Leary at: Kathleen.O'Leary@usdoj.gov

2.  Department of Justice Environmental Crimes Section:

    John D. Cashman at: john.cashman@usdoj.gov

    Joseph A. Poux, Jr. at: joseph.poux@usdoj.gov

    or by mail to:

    > Environmental Crimes Section
    > Environment and Natural Resources Division
    > United States Department of Justice
    > 601 D Street, N.W.
    > Washington, D.C. 20004

3.  United States Probation Office, District of New Jersey:

    > Supervision Unit
    > U.S. Courthouse
    > 50 Walnut Street, Room 1001
    > Newark, NJ 07102
    > (973) 645-4240
    > Attn: Donald Martenz
    > at: DONALD_MARTENZ@NJP.USCOURTS.GOV

4.  CG-INV: Submissions from DSI to CG-INV may be emailed to the following address if the file(s) are less than 10GB: USCGECP@uscg.mil. If the total file(s) to be sent exceed 10GB, the file(s) may be sent to USCGECP@uscg.mil, as the recipient, via the Safe File Exchange (SAFE) site for non-CAC users available at https://safe.amrdec.army.mil/safe/Welcome.aspx ; otherwise, the report shall be provided to CG-INV in hard copy to:

    > Office of Investigations and Casualty Analysis (CG-INV-1)
    > Base National Capital Region
    > 2703 Martin Luther King Jr. Ave SE, Stop 7501
    > Washington, D.C. 20593

144883.06501/105962873v.3

5.      First Coast Guard District:

LT Nicole Bredariol at: nicole.e.bredariol@uscg.mil

or by mail to:

> Commander (dl)
> First Coast Guard District
> 408 Atlantic Ave.
> Boston, MA 02110

144883.06501/105962873v.3